WILLIAM AND JAMES BROWN AND COMPANY, PLAINTIFFS IN ERROR,
*vs.* THOMAS M'GRAN; DEFENDANT IN ERROR.

An action was instituted against the consignees of two hundred bales of cotton, shipped by the direction of the owner to Liverpool, on which the owner had received an advance by an acceptance of his bills on New York; which acceptance was paid out by bills drawn on the consignees of the cotton in Liverpool. Some time after the shipment of the cotton, the owner wrote to the consignees in Liverpool, expressing his "wishes", that the cotton should not be sold until they should hear further from him. In answer to this letter, the consignees say, "Your wishes in respect to the cotton are noted accordingly." No other provision than from the sale of the cotton for the payment of the advance, was made by the consignor, when the same was shipped; and no instructions for its reservation from sale were given, when the shipment was made. Immediately after the acceptance of the bill drawn against the cotton, on the consignees in Liverpool, they sold the same for a profit of about ten per cent. on the shipment. Cotton rose in price in Liverpool to more than fifty per cent. profit on the invoice, between the acceptance of the bill of exchange, and the arrival of the same at maturity. The shipper instituted an action against the consignees for the recovery of the difference between the actual sales and the sum the same would have brought had it been sold at the subsequent high prices at Liverpool.

It is certainly true, as a general rule, that the interpretation of written instruments properly belongs to the Court, and not to the jury. But there certainly are cases in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury, for the purpose of carrying into effect the real intention of the parties. This is especially applicable to cases of commercial correspondence, where the real objects, and intentions, and agreements of the parties are often to be arrived at only by allusions to circumstances which are but imperfectly developed.

There can be no reasonable doubt that in particular circumstances, a wish expressed by a consignor to a factor, may amount to a positive command.

In the case of a simple consignment of goods, without any interest in the consignee, or any advance or liability incurred on account thereof, the wishes of the consignor may fairly be presumed to be orders; and the "noting the wishes accordingly," by the consignees, an assent to follow them. But very different considerations might apply where the consignee should be one clothed with a special interest, and a special property, founded upon advances and liabilities.

Whenever a consignment is made to a factor for sale, the consignor has a right, generally, to control the sale thereof according to his own pleasure, from time to time, if no advances have been made, or liabilities incurred, on account thereof; and the factor is bound to obey his orders. This arises from the ordinary relation of principal and agent. If, however, the factor makes advances, or incurs liabilities on account of the consignment, by which he acquires a special property in the goods, then the factor has a right to sell so much of the consignment as may be necessary to reimburse such advances, or meet such liabilities; unless there is some agreement between himself and the consignor which contracts or varies this right.

If, cotemporaneous with the consignment and advances or liabilities, there are orders given by the consignor, which are assented to by the factor, that the goods shall not be sold before a fixed time, in such a case the consignment is presumed to be received subject to such order; and the factor is not at liberty to sell the goods to reimburse his advances, until after that time has elapsed. So when orders are given not to sell below a fixed price; unless the consignor shall, after due notice and request, refuse to provide other means to reimburse the factor. In no case will the factor be at liberty to sell the consignment, contrary to the orders of the consignor, although he has made advances or incurred liabilities thereon; if the consignor stands ready and offers to reimburse and discharge such advances and liabilities.

When the consignment is made generally, without any specific orders as to the time and mode of sales, and the factor makes advances or incurs liabilities on the footing of such

[Brown and Company *vs.* M'Gran.]

consignment, the legal presumption is, that the factor is intended to be clothed with the ordinary rights of factors, to sell, in the exercise of a sound discretion, at such time and in such manner as the usage of trade and his general duty require, and to reimburse himself for his liabilities, out of the proceeds of the sale: and the consignor has no right, by any subsequent orders, given after advances have been made, or liabilities incurred by the factor, to suspend or control this right of sale, except so far as respects the surplus of the consignment not necessary for the reimbursement of such advances or liabilities.

If a sale of cotton in Liverpool, by a factor, has been made on a particular day, tortiously, and against the orders of the owner, the owner has a right to claim damages for the value of the cotton on the day the sale was made, as for a tortious conversion. If the sale of the cotton by the factor was authorized on a subsequent day, and the cotton had been sold against orders, before that day, the damages to which the owner would be entitled would be regulated by the price of cotton on that day. But the rate of damages should not be obtained from the prices of cotton at any time between the day when the cotton was sold, against the orders of the owner, and the day on which the sale was authorized by him.

IN error to the Circuit Court of the United States, for the District of Georgia.

In the Inferior Court of Richmond county, in the state of Georgia, Thomas M'Gran, the defendant, instituted a suit by attachment against the plaintiffs in error, to recover damages for the sale of two hundred bales of cotton, shipped by him to the plaintiffs in error, as his factors; the cotton having been sold for a less price than the same would have produced had the sales been made according to the instructions of the shipper.

The declaration contained three counts, all upon the shipment of the two hundred bales of cotton, by Thomas M'Gran to William and James Brown and Company, at Liverpool, as the factors of the shipper.

The first count alleges, that while the cotton remained in the hands of the consignees, the shipper ordered him to hold the cotton until they should hear from him again; but the same was sold in violation of the order, and to the damage of the shipper.

The second count charges the consignees with not having exercised reasonable diligence in keeping and selling the cotton; but that they dealt with the same so negligently and carelessly, so that it was sold at a loss to the shipper.

The third count alleges, that the consignees did not sell the cotton to the best interests of the shipper, nor did they obey his instructions; but on the contrary, managed the same carelessly and negligently, and sold the same contrary to orders, with a reasonable prospect of rise of the article, for three thousand dollars less than the value of the cotton, at the time the same was sold.

The case was removed, under the provisions of the Judiciary Act of 1789, to the Circuit Court of the United States, for the District of Georgia; the defendants below not being citizens of the state of Georgia, and not residing in that state.

The defendants pleaded the general issue, and the cause having been tried in the Circuit Court, the jury gave a verdict for the plaintiff, Thomas M'Gran, under the directions of the Court, for four

thousand nine hundred and seventy-five dollars and fifty-seven cents. The defendants excepted to the ruling of the Circuit Court; on questions submitted during the trial of this cause, and they prosecuted this writ of error.

On the trial it was given in evidence, that two hundred bales of cotton were shipped by defendant in error, from Mobile, to the plaintiffs in error, at Liverpool, as his factors, to be sold by them under a del credere commission. That this cotton was received by them about the 9th of April, 1833, and cost, per invoice, nine thousand one hundred and fifty-one dollars and seventy-seven cents. That the plaintiffs in error, through Brown, Brothers, and Company, their house in New York, accepted, early in March, 1833, a draft of defendant in error, for nine thousand dollars, drawn against said cotton, upon their said house in New York; that when this draft arrived at maturity, the said house in New York paid the same, and in order to reimburse themselves, and in pursuance of an arrangement between plaintiffs in error and defendant in error, drew upon the plaintiffs in error, at Liverpool at sixty days' sight, for one thousand eight hundred and seventy-one pounds and nine pence sterling. This draft was dated May 7th, 1833, was accepted by plaintiffs in error, at Liverpool, June 3d, 1833, and fell due and was paid by them on the 5th of August following. That by the contract between the plaintiffs in error, and the defendant in error, the cotton in question became pledged by the defendant in error to the plaintiffs in error, to enable them to meet their acceptances and repay their advance thereon.

After shipping the cotton and drawing against it as aforesaid, the defendant in error became insolvent.

On June 3d, 1833, plaintiffs in error sold said two hundred bales of cotton for two thousand and seventy-three pounds four shillings and sixpence, cash, September 16th 1833; being a profit of about ten per cent. On the same day on which they sold this cotton, they sold six hundred and seventy-seven bales, in which their Baltimore house was interested; and, in a week previous, had sold two hundred and sixteen bales, in which their Baltimore house was also interested.

At the time of the sale of the two hundred bales of cotton, the defendant in error was indebted to plaintiffs in error in a large sum.

During the week in which the two hundred bales were sold, the sales of cotton amounted to forty-seven thousand two hundred and fifty bales: a larger amount than in any previous week for about eight years.

On April 20th, 1833, the defendant in error wrote to plaintiffs in error: "If you have any cottons on hand when this reaches you, in which I am interested, I wish you to hold them until you hear from me again."

This letter was received by William and James Brown and Company, on the 23d of May, 1833; and on the day following, the 24th of May, 1833, they wrote to Thomas M'Gran: "We are in pos-

session of your esteemed favour of the 20th ultimo, and your wishes in respect to the cotton we now hold on your account, are noted accordingly."

On June 9th, following, the plaintiffs in error wrote to defendant, annexing a circular, showing the extensive business done in cotton during the week, and a material improvement in prices; and informed him that, believing this advance would probably equal the expectations he had formed when he last wrote, and thinking it desirable to close his cotton in their hands, as they had then been drawn upon for the advance on it, they had taken advantage of this brisk demand to dispose of the two hundred bales at an advance of one-half to five-eighths of a penny per pound upon its value when first landed.

On July 30th, 1833, the defendant in error replied to the last letter, referring to his previous letter of April 20th, and asked of plaintiffs in error, " why did you sacrifice my cottons as the draft drawn by Brown, Brothers, and Company, at sixty days, on account of these cottons, could not have been accepted more than a day or two before? Therefore, you had sixty days before you had any money to pay for me." He adds: " I do not recognise the sale; and do not consider you authorized to sell the cotton before the time the draft drawn on you by Brown, Brothers, and Company, against this cotton, falls due. If the price is higher on that day than the day you sold it, I will expect you to allow me the difference; and if it is lower, I will be prepared to pay you any balance I may owe you."

On September 4th, 1833, the plaintiffs in error replied, that there had been a balance due to them from defendant; that the two hundred bales were sold at an advance, and barely squared the accounts. That defendant had been obliged to stop payment, that any loss would be certain to fall on them, and profit not likely to go to him, but to his creditors. That the cotton was not sacrificed, but sold at a profit, such as is not frequently realized on that article; that they sold some on account of their Baltimore house, and some immediately before, and immediately after, in which their said Baltimore house was interested. That near fifty thousand bales changed hands in the same week. That, situated as the defendant in error then was, he could not reasonably have expected them to hold the cotton, without pointing out in what manner they should be indemnified in event of loss thereby. That the fact that Brown, Brothers, and Company's draft was not due did not alter the case, as they had become responsible some months before, by Brown, Brothers, and Company's acceptance of the draft of the shippers.

On July 22d, 1833, the defendant in error wrote to plaintiffs, that he had received their favour of the 24th of May, and noted the contents. That they would please to sell the two hundred bales soon after the receipt of the letter, unless they were of opinion they could do better by holding a little longer. This letter was received by the plaintiffs in error, August 23d, 1833.

[Brown and Company vs. M'Gran.]

The counsel for the defendant below, prayed the Court to instruct the jury, that the matters given in evidence on the part of the defendants were sufficient, and ought to be admitted to bar the plaintiff's action; which instruction the Court refused to give.

And the Court further refused to instruct the jury:

1. That the advance by the house of Browns, in New York, was in effect an advance by the house in Liverpool; and after the advance so made, the shipper had no right to alter the instructions which were given at the time of such advance.

2. That the house in Liverpool having advanced so large an amount on this cotton, having a large previous unsettled claim against the shipper, and the said shipper having afterwards, and before the sale of the cotton, become insolvent; the house in Liverpool had a right to sell for their reimbursement, notwithstanding the subsequent orders of the shipper.

And the Court instructed the jury that it was their exclusive province to decide from the evidence in the cause, whether the defendants had advanced any money to the plaintiff on the cotton shipped by the Mary and Harriet. Whether, when the defendants sold said cotton, the plaintiff was indebted to them upon a previous unsettled claim, and whether the plaintiff had become insolvent before the sale of said cotton; and also further instructed the jury, that if they found from the evidence in the cause, that the plaintiff had given instructions to the defendants by his letter of the 20th of April, 1833, not to sell any cottons which the defendants might have on hand when that letter reached them, in which the plaintiff was interested, until the defendants heard from him again, and that such instructions were received and recognised by the defendants, by the evidence in the cause, and particularly by a letter given in evidence as one from the defendants to the plaintiff, dated the 24th of May, 1833, in reply to the plaintiff's letter to them of the 20th of April, 1833; that then the defendants were not justifiable in law in the sale of the 3d of June, 1833, on account of the defendants having on that day accepted Brown, Brothers, and Company's draft for one thousand eight hundred and seventy-one pounds and ninepence, dated 7th of May, 1833, at sixty days' sight.

And the Court further instructed the jury, that if they found from the evidence in the cause, that cottons were selling for a higher price from the 3d June, 1833, when the draft was accepted, and when the cotton was sold, until the time when the said draft was mature and payable, and if the evidence in the cause ascertains at any time before the maturity of the draft, what such higher price was, and that the cotton belonging to the plaintiff could have been sold for such higher price; that then the plaintiff was entitled to recover from the defendants the difference in price between the sum for which the defendants sold the plaintiff's cotton, and the sum at which it might have been sold before or at the maturity of the draft.

The defendants in the Circuit Court, excepted to these instructions.

· The case was argued by Mr. G. W. Brown, for the plaintiffs in error; and by Mr. Jones, for the defendant.

Mr. Brown contended,

1. That although an agent is generally bound to conform to the instructions of his principal, the circumstances of this case were such as to give the plaintiffs in error a right to sell the cotton in question, notwithstanding the letter of the defendant in error, of April 20th, 1833.

The cotton was shipped by M'Gran to the Browns, as his factors; and this circumstance alone was equivalent to an authority to sell. The definition of a factor is, "an agent who is commissioned by a merchant or other person to sell goods for him, and to receive the proceeds." Selw. N. P. 827. If at the time when the consignment was made, the consignor had given instructions as to the manner or time of sale, the consignees would have been bound to comply with them. But no such instructions were given. This was a general consignment; and the evidence discloses the fact that, upon the faith of this consignment, the Browns accepted bills to the amount of nearly the full value of the cotton. The invoice cost of the cotton was nine thousand one hundred and fifty one dollars and seventy-seven cents; the bill drawn against it amounted to nine thousand dollars. The evidence further shows—and all the evidence in the case was offered by the defendant in error—that this bill was accepted by the plaintiffs in error, through their house in New York of Brown, Brothers, and Company. When this bill arrived at maturity, it was paid by the house in New York, who, in order to reimburse themselves, drew a bill upon the plaintiffs in error, dated May 7th, 1833, at sixty days' sight, for one thousand eight hundred and seventy-one pounds and nine pence, which was accepted by them, June 3d, 1833, and fell due and was paid on the 5th of August following. This arrangement was in conformity with the contract made by the parties, was in accordance with the regular course of trade, and was highly advantageous to the shipper. The cotton arrived at Liverpool, April 9th, 1833, and was not sold until June 3d—a period of fifty-five days. At the time of the sale, M'Gran was indebted to the plaintiffs in error in a considerable balance, and had become insolvent.

Under these circumstances, it is contended, that the plaintiffs in error acquired a special property in the cotton, with a power of sale, in order to reimburse themselves for the advance made through their house in New York, and to put themselves in funds to meet their acceptance of the bill drawn by said house against the shipment. 2 Kent's Com. 640. 642. Story on Bailments, 204, 205. 218. Story on Agency, 382. Parker vs. Brancher, 2 Law Rep. 46. 3 Chitty on Com. and Manufac. 551. Pothonier vs. Dawson, 3 E. C. L. R. 135. Zoit vs. Millauden, 16 Martin's Rep. 470.

The contract of the consignees with the consignor, in effect amounted to this: "We will consent to accept to such an amount

[Brown and Company *vs.* M'Gran.]

upon your consignment, provided we have the right of selling, in order to put ourselves in funds to meet our acceptance." That such a right to sell existed, seems to be admitted by M'Gran throughout the correspondence; notwithstanding his complaints as to the time when the sale was made.

Upon the principles of commercial law, M'Gran, having drawn upon the Messrs. Brown without having funds in their hands, was bound to put them in funds to meet the bill so drawn. Bainbridge & Co. *vs.* Wilcocks, 1 Baldw. Rep. 538.

There is a strong analogy between the case of a consignment of goods to secure an acceptance or advances, and the case of a mortgage with a power to sell annexed. Drinkwater *vs.* Goodwin, 1 Cowp. 256. In both cases there is a power to sell, coupled with an interest or estate in the thing pledged. Rice *vs.* Austin, 17 Mass. Rep. 200. Hunt *vs.* Rousmanierie's Exec. 8 Wheat. 203. This power was irrevocable; it could not be affected by the express revocation of M'Gran, or by the death or bankruptcy of the consignor or consignees. Story on Agency, 387. 504. 1 Bell's Com. § 413, 4th edit. And, a fortiori, it could not be revoked by the mere expression of M'Gran's wishes, contained in his letter of April 20th. M'Gran does not "order" nor "direct;" he does not even "request;" but makes use of the mildest word that can express the idea of desire; he simply "wishes." But it will be contended, that M'Gran's wishes became binding upon the plaintiffs in error, upon their supposed assent contained in their reply of May 24th, 1833. They there say that they had received the letter of defendant in error, and that his wishes in respect to the cotton they then held on his account were "noted accordingly." The expression means nothing more than that they observed the wishes of their correspondent, as contained in his letter; they do not promise to comply with them in all events; they reserve to themselves the privilege of giving effect to them or not, as might be consistent with the protection of their own interests and legal rights. The expression "to note" never properly means to assent; and no usage can be found to justify our attaching to it such a signification in this case. Crabbe's Syn. Webster's Dict.

There are many much stronger cases in the law, where similar expressions have been decided not to be equivalent to an assent. Perring and others *vs.* Hone, 13 E. C. L. R. 328, Opinion of Best, J. Rees *vs.* Warwick, 2 Barn. and Ald. 133; observed upon by Parke, J. in Fairlie *vs.* Herring, 13 E. C. L. R. 78. Powell *vs.* Jones, 1 Esp. C. 17. 2 Pardessus Cours de Droit Commercial, 171.

But if, in mercantile language, the expression conveys the idea of assent, there should be some evidence offered of that fact. The learned judge before whom the case was tried, erred in leaving it to the jury to say, 1st. Whether defendant in error, by his letter of April 20th, instructed the plaintiffs in error; and 2d. Whether the plaintiffs in error recognised these instructions; when no evidence whatever was laid before the jury to enlighten them as to the meaning of the expressions used. Story on Agency, 63. 72, n. 1.

2 s 2

Ekins vs. Maclish, Ambler, 184, 185.    Mechanics' Bank vs. Bank of Columbia, 5 Wheat. 326.    Lucas vs. Groning, 2 E. C. L. R. 61. Macbeath vs. Haldimand, 1 Term Rep. 172.

M'Gran, in his letter of July 30th, in which he complains of the sale of the cotton, really admits the right of the Browns to sell, in order to meet the bill drawn on them.    He says, " I do not recognise the sale, and do not consider you authorized to sell the cotton before the draft drawn on you by Brown, Brothers, and Company, against this cotton, falls due.    If the price is higher on that day than the day you sold it, I will expect you to allow me the difference; and if it is lower, I will be prepared to pay you any balance I may owe you."

Now this abandons the whole ground.    M'Gran, by his letter of April 20th, had instructed, as it is contended on the other side, the plaintiffs in error not to sell until they heard from him again.    They did not hear from him again until August 23d, when his next letter, dated July 22d, and ordering them to sell, was received.    Now the plaintiffs in error were bound by the instructions of M'Gran, or they were not.    If they were bound, they had no right to sell until August 23d, when his orders to sell were received.    If they were not bound, as M'Gran admits—for he concedes that they had a right to sell at the date of the maturity of the draft, August 5th—then they were to use their own discretion, as skilful and honest factors, as to the time of sale.    M'Gran admits they had a right to sell in order to meet the bill, notwithstanding his instructions; but limits them to a single day—that of the maturity of the draft.    This position is absurd.    On that day it might have happened that no purchasers could be found, or that the cotton had fallen so low that the whole would not produce enough to meet the bill.

Again, if M'Gran had the right to instruct his factors to hold his cotton for four months, he would have had the same right to instruct them to hold it for four years.    He might have done so with little inconvenience to himself; for he had received as an advance nearly the whole invoice cost.

This argument derives much additional force, from the fact that M'Gran, at the time when the order not to sell was given, had become insolvent, and was in debt to plaintiffs in error.

The policy of the law will induce the Court to uphold the sale. The Messrs. Brown acted in good faith, and no doubt, with prudence, although the result proved unsatisfactory.    They did all that could be expected, for they acted for M'Gran precisely as they did for themselves.    On the same day they sold six hundred and seventy-seven bales, on account of nine different parties, in part of which their Baltimore house was interested; and, within a week previously, two hundred and fifteen bales, in which the Baltimore house was also concerned.    A larger business was done at Liverpool in cotton during the week in which the sale was made, than had been done in any one week for the preceding eight years.    The cotton was held upwards of fifty days, and sold at a profit of nearly

ten per cent. more, according to the testimony, than is generally realized in that article. Where no fraud is chargeable on an agent, his conduct ought to receive a liberal and favourable construction. Drummond et al. *vs.* Wood, 2 Caines, 310.

But if the plaintiffs in error did recognise the instructions of the defendant in error, it was merely an admission as to the legal effect of a contract, and cannot conclude them. 2 Phil. on Ev. 4th edit., and cases there cited.

But conceding, for the sake of argument, that the correspondence in the case amounts to an agreement on the part of the plaintiffs in error, that they would hold the cotton until instructed by M'Gran to sell; it is contended that such an agreement would not be binding, because it was made without consideration.

A valuable consideration had already passed between the parties. M'Gran had shipped cotton to plaintiffs in error, who, upon the faith of the shipment, had come under an advance and acceptance to a large amount; the contract was then concluded, and binding upon both parties, and no new agreement could be engrafted upon it without a new consideration. To make a contract binding, the consideration must be either a benefit to the party promising, or some trouble or prejudice to the party to whom the promise is made; but here there was merely a gratuitous undertaking on the part of the plaintiffs in error to comply with the wishes of the defendant in error. Suppose that M'Gran, in his letter of the 20th of April, had written to the Messrs. Brown that he had become dissatisfied with their conduct as his factors, and requested them, upon the receipt of his letter, to deliver the cotton to some other agent named by him, and that the Messrs. Brown had replied, that they had received his letter, and noted his wishes accordingly. Could it be for a moment contended that upon the strength of this supposed assent, M'Gran could sustain an action of trover against the plaintiffs in error for the cotton, without paying the amount of their advances? But if the assent of the plaintiffs in error in the case at bar, was sufficient entirely to destroy their rights over the cotton in question, there is no reason why it should not do so in the case supposed.

2. But it is contended that the Court erred in instructing the jury that the measure of damages was the difference between the price for which the cotton was sold, and that which could have been obtained at any time from the day of sale to the period when the bill arrived at maturity.

The cotton was sold June 3d. On the same day the bill was accepted, and became due August 5th. But M'Gran had, as he alleges, by his letter of April 20th, forbidden the Messrs. Brown to sell, and his next letter, authorizing them to sell upon its being received, was not received until August 23d. If then the plaintiffs were bound by his instructions, they were not authorized to sell until August 23d; and the damage, if any, sustained by him, is for their not selling on or after that day. But there is no evidence in the case to show

what was the price-of cotton on or after that day, and therefore it does not appear that M'Gran has sustained any damage whatever.

The relation of principal and agent is governed by the general rules of the law founded on reason; and if the principal suffers through the remissness or negligence of the agent, the actual loss sustained by the principal in consequence of such misconduct, is the standard by which his damages must be measured. Hamilton et al. vs. Cunningham, 2 Brock. Rep. 366.

3. It is also contended, that the Court erred in instructing the jury, that if they found from the evidence in the cause, that cottons were selling for a higher price from the 3d June, 1833, when the draft was accepted, and when the cotton was sold, until the time when the draft was mature and payable, and if the evidence in the cause ascertains, at any time before the maturity of the draft, what such higher price was, and that the cotton belonging to the defendant in error could have been sold for such higher price, that then the defendant in error was entitled to recover from the plaintiffs in error the difference in price between the sum for which the plaintiffs in error sold the cotton of defendant in error, and the sum for which it might have been sold before or at the maturity of the draft, without making it necessary for them to find any other fact. This instruction is entirely independent of, and unconnected with, the preceding instructions of the Court. Upon finding simply the facts mentioned in it, the jury were told that they must bring in a verdict for the defendant in error, without reference to any of the other important facts proved in the case. This instruction was calculated to mislead the jury, and is therefore erroneous. Gist vs. Cockey, 7 Har. and John. 141.

Mr. Jones, for the defendant, denied that the acceptance of a draft, drawn by the owner or consignor against goods shipped to the factor, gives a right to the factor to sell the goods before the draft is payable. He cited, 6 Barn. and Cres. 36. 13 Com. Law Rep. 106. 1 Campbell's Rep. 410. 2 Starkie's Rep. 272. 2 Saunders' Plead. and Ev. 641.

He contended that the letter of the plaintiffs in error, of the 24th May, 1833, in answer to the letter of Thomas M'Gran, of the 20th of April, 1833, in which they say, " your wishes in respect to the cotton we now hold on your account, are noted accordingly," was a contract not to sell the cotton, until further instructions from the owner of the same. That it amounted to an unequivocal accession, in terms, to the order of the 20th of April, and to the clearest implication to abide by it.

Yet, on the 23d June, when the time had arrived when the duties on cotton were reduced, a period when the prices of cotton would increase, and before the effects of that, and other concurring causes of a rapidly increasing demand, and proportional advance of prices, could be fairly developed, they forced his cotton into market, in the

teeth of his order, and of their unqualified accession to its terms only ten days before.

Cotton continued to advance in the Liverpool market after the sale; and at the time the plaintiffs in error were authorized by the subsequent letter of Thomas M'Gran to make sales, it had risen to a price which fully authorized the verdict of the jury.

But there was no occasion, nor was there any right to sell the cotton shipped by the defendant in error, for the purpose of reimbursement, until the acceptance of the bill drawn in New York should be matured. No advances in cash had been made by the house in New York, and nothing had been paid by the house in Liverpool. The whole accommodation afforded to the shipper of the cotton was mere paper facilities, by acceptances in New York; and when those acceptances became due, by a draft on Liverpool.

Mr. Jones considered that the proper test of the amount of the damages to which the defendant was entitled, was that which, under the instructions of the Circuit Court, had been adopted by the jury. The evidence showed the rise of the price of cotton, and as the plaintiffs in error were bound to keep it after their receipt of the letter of the 20th of April, the prices, until the draft was paid, should be considered as those to which the owner of the cotton was entitled.

He argued, 1. That as to the instructions rejected by the Court, they were, both in form and substance, in all their premises, and in all their conclusions, utterly inadmissible.

2. That the instructions actually given by the Court to the jury, so far from supplying any cause of complaint, were even more favourable to defendants than any they were strictly entitled to ask, and in all other respects unexceptionable.

Mr. Brown, in reply.

The argument of the learned counsel for the defendant in error proceeds upon the ground that the plaintiffs in error had a mere lien on the cotton in question, which could be waived by such an assent as is supposed to be implied by their letter of May 24th. But the authorities cited show that factors, under the circumstances existing in this case, have something more than a naked lien: they have a special property in the thing itself; a power of sale, coupled with an interest; and such a right cannot be waived, without at least an intention to do so being clearly and unequivocally expressed.

Mr. Justice STORY delivered the opinion of the Court.

This is a writ of error to a judgment of the Circuit Court of the District of Georgia, rendered in an action in which M'Gran, the defendant in error, was originally plaintiff.

In the spring of 1833, M'Gran, a merchant in Georgia, shipped two hundred bales of cotton, consigned to the plaintiffs in error, a house of trade in Liverpool, England, there doing business under the firm of William and James Brown and Company, for sale on

his account.   The shipment was made under an arrangement with the house of Brown, Brothers, and Company, of New York, composed (as seems admitted) either wholly or in part of the partners in the Liverpool house, by which the New York house accepted a draft drawn upon them by M'Gran for nine thousand dollars, the invoice value of the cotton being only nine thousand one hundred and fifty-one dollars and seventy-seven cents; and were to reimburse themselves by a draft on the Liverpool house.   Accordingly, the New York house on the 12th of March, 1833, addressed a letter to the Liverpool house, in which they state: "We enclose a bill of lading for two hundred bales of cotton, shipped by M'Loskey, Hagar, and Company, of Mobile, per ship Mary and Harriet, on account of Mr. Thomas M'Gran of Augusta, on which you will please effect insurance.  This cotton cost, per invoice, nine thousand one hundred and fifty-one dollars and seventy-seven cents. We have accepted Mr. M'Gran's draft against this cotton, for nine thousand dollars, for which we shall draw on you for our reimbursement when it matures.   In handing this draft for acceptance, Mr. M'Gran says, he would not have drawn for so large an advance, were it not that there is a balance at his credit with you, which has accumulated within the past two years; so that if this should not produce enough to meet the advance, it will be covered by what is at his credit."   The existence of any such balance was utterly denied at the trial; and the Liverpool house contended that there was a balance the other way.

The cotton duly arrived at Liverpool on or about the 9th of April, 1833.   The New York house drew on the Liverpool house for their reimbursement, a bill dated the 7th of May, 1833, for one thousand eight hundred and seventy-one pounds and nine pence, at sixty days' sight, being the amount of the advance; and that bill was accepted by the Liverpool house, on the 3d of June, 1833, and became payable, and was paid on the 5th of August following.   On the 3d of June, 1833, the very day of the acceptance, the Liverpool house sold the two hundred bales of cotton, (the market then being on the rise,) on a credit, for the nett sum of two thousand and seventy-three pounds four shillings and sixpence.   After deducting the charges (which amounted to nearly twenty-five per cent.) which became due and payable on the 16th of September, 1833; and according to an account current rendered to M'Gran, by the Liverpool house on the 29th of June, 1833, the whole transactions between the parties, including the sale of this cotton, left a balance of three hundred and ninety-two pounds fifteen shillings and eight pence, due to M'Gran.

At the time when the shipment was made, and the advance arranged therefor, no instructions were given by M'Gran, touching the sale of the cotton.   It accordingly went to the consignees, as factors for sale, the advances having been as above mentioned without any other contract than that implied by law as between a principal and a factor, making advances; that is to say, that the factor is to make

sale of the goods, consigned to him, according to his own judgment, in the exercise of a sound discretion as to the time and mode of sale, having regard to the usages of trade at the place of sale; and to reimburse himself out of the proceeds for his advances, and other balance due him.

After the shipment and advance were so made, viz., on the 20th of April, 1833, M'Gran addressed a letter to the Liverpool house, in which, after acknowledging the receipt of letters of the 4th and 5th of March, from them, he added: "If you have any cottons on hand when this reaches you, in which I am interested, I wish you to hold them until you hear from me again." The Liverpool house, in a reply to this letter on the 24th of May, 1833, used the following language: "We are in possession of your esteemed favour of the 20th ultimo, and your wishes in respect to the cotton we now hold on your account, are noted accordingly." At this time by advices received from other correspondents, the Liverpool house were in possession of information that, at least as early as the 8th of April, 1833, M'Gran had failed in business.

On the 22d of July, 1833, M'Gran wrote a letter to the Liverpool house, acknowledging the receipt of their letter of the 24th of May, in which he says: "I have your favour of the 31st (the 24th) of May, and note the contents. You will please sell my two hundred bales of cotton soon after the receipt of this, unless you are of opinion you can do better by holding a little longer." This letter was received by the Liverpool house on or about the 23d day of August, 1833.

On the 7th of June, 1833, the Liverpool house informed M'Gran of the sale of the cotton: and in a letter under date of the 30th of July, 1833, in reply thereto, M'Gran expressed his surprise at the sale; and added: "I beg leave to refer you to my letter of the 20th of April last, the receipt of which you have acknowledged, instructing you not to sell any cottons you had on hand, in which I am interested until you heard from me again. Why did you sacrifice my cottons, as the draft drawn by Brown, Brothers, and Company at sixty days on account of these cottons, could not have been accepted more than a day or two before, as it went forward by the packet of the 8th of May. Therefore, you had sixty days before you had any money to pay for me." And after some other remarks in the style of complaint, he adds: "You will please take notice, that I do not recognise the sale, and do not consider you authorized to sell the cotton before the time the draft drawn on you by Brown, Brothers, and Company against this cotton, falls due. If the price is higher on that day than the day you sold it, I will expect you to allow the difference; and if it is lower, I will be prepared to pay you any balance I may owe you." To this letter the Liverpool house replied by a letter dated the 4th of September, 1833, in which they vindicated their conduct, and among other things, said: "We beg you to bear in mind, that there was a balance due us from you, on joint transaction from Mr. Clarke; that the two hundred

bales in question were sold after the market had advanced one-half penny per pound, and that it barely squares the account. You had, unfortunately, been obliged to stop payment. We had the opportunity of paying ourselves by selling your cotton in a brisk market to a profit of ten per cent.; and we ask whether it was reasonable, under such circumstances, to expect us to hold the cotton for the chance of further profit, when the loss, if any, was certain to fall on us, and the profit not likely to go to you, but to your creditors, as was supposed, of whom we knew nothing. This would have been the extreme of injustice toward ourselves and our absent partners, without being any advantage to you." And after some other remarks vindicating their conduct, they farther said: "We think you must admit, that situated as you then were you could not reasonably have expected us to hold the cotton, without pointing out in what manner we should be indemnified in event of loss thereby. That Brown, Brothers, and Company's draft was not due, does not alter the case. We had become responsible some months before by Brown, Brothers, and Company's acceptance of the draft of the shippers."

Here the correspondence between the parties seems to have closed. The present action was brought to recover damages against the Liverpool house, for a supposed breach of orders, and of their duty as factors. At the trial there was an account current between the parties, and other evidence before the jury; the whole evidence in the case, however, was introduced by M'Gran. Among other questions before the jury, were the following: whether the advance made by the New York house, was, in effect, an advance by the Liverpool house, either as agents, or as partners in the latter; whether there was any balance due to the Liverpool house upon the former transactions; whether M'Gran was insolvent or not, according to the advices received by the Liverpool house; and whether, under the circumstances disclosed in the evidence, the Liverpool house had a right to sell the two hundred bales of cotton for their reimbursement, notwithstanding the wishes or orders contained in the letter of the 20th of April.

The jury at the trial found a verdict for the plaintiff, (M'Gran,) for four thousand nine hundred and seventy-eight dollars and fifty-seven cents, under certain instructions given by the Court, upon which verdict judgment was accordingly rendered: and a bill of exceptions having been taken by the original defendants; the cause now comes before us for revision, upon the points made and instructions given at the trial.

The counsel for the defendants asked the Court to instruct the jury, 1. That the advance by the house of Brown, in New York, was, in effect, an advance by the house in Liverpool; and after the advance so made, the shipper had no right to alter the instructions which were given at the time of such advance. 2. That the house in Liverpool having advanced so large an amount on this cotton, having a previous unsettled claim against the shipper, and the

shipper having afterwards and before the sale of the cotton, become insolvent, the house in Liverpool had a right to sell for their reimbursement, notwithstanding the subsequent orders of the shipper.

The Court refused to give these instructions; and, in our judgment, with great propriety; as each of them involved matters of fact in controversy before the jury upon which it was exclusively their province to decide. If the defendants meant to draw from the Court an opinion in point of law upon the assumed facts, the proper mode would have been to have asked the Court to instruct the jury, that if they found the facts to be as thus assumed, then that the law was as these instructions stated.

The Court then proceeded to instruct the jury, that if they found from the evidence in the cause that the plaintiff had given instructions to the defendants, by his letter of the 20th of April, 1833, not to sell any cottons which the defendants might have on hand when that letter reached them, in which the plaintiff was interested, until the defendants heard from him again; and that such instructions were received and recognised by the defendants, by the evidence in the cause, and particularly by a letter given in evidence as one from the defendants to the plaintiff, dated the 24th of May, 1833, in reply to the plaintiff's letter to them of the 20th of April, 1833; that then the defendants were not justifiable in law in the sale of the 3d of June, 1833, on account of the defendants having on that day accepted Brown, Brothers, and Company's draft for one thousand eight hundred and seventy-one pounds and nine pence, dated the 7th of May, 1833, at sixty days' sight.

It is observable that this instruction is given in absolute terms, without reference to any other facts in the cause which might be found by the jury upon the evidence before them; and therefore must be deemed to apply to every posture of the facts which the evidence might warrant. It must, therefore, be deemed to apply to the case, although the advance was originally made by the New York house for and on account of the Liverpool house, as agents or partners thereof; or the Liverpool house had entered into engagements prior to the advance, to become responsible for the reimbursement thereof to the New York house, in the manner stated in the evidence; and although the plaintiff was, before the writing of the letters, actually insolvent, and had failed in business; and that fact was known to the defendants.

One objection taken to this instruction is, that it leaves to the jury the construction of the language of the letters of the 20th of April, and 24th of May. It is certainly true, as a general rule, that the interpretation of written instruments properly belongs to the Court, and not to the jury. But there certainly are cases, in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury for the purpose of carrying into effect the real intention of the parties. This is especially applicable to cases of commercial correspondence,

where the real objects, and intentions, and agreements of the parties, are often to be arrived at only by allusions to circumstances which are but imperfectly developed. The present case sufficiently illustrates the distinction. M'Gran, in the letter of the 20th of April, says, that he wishes the defendants to hold any cottons on hand until they hear from him again. Now, this language, certainly, ordinarily imports only a desire, and not an order; and yet there can be no reasonable doubt, that under particular circumstances a wish expressed by a consignor to a factor may amount to a positive command. So, in the reply of the 24th of May, the defendants say, "your wishes in respect to the cotton we now hold on your account, are noted accordingly."

Here again the point is open, whether the language imports that the defendants construed the wishes of the plaintiff to be simply a strong expression of desire or opinion, or a positive order; and also, whether the words "noted accordingly" import that the defendants took notice thereof, or took notice of, and assented to obey, the wishes or order of the plaintiff. The language is susceptible of either interpretation, according to circumstances. If the case had been one of simple consignment, without any interest in the consignee, or any advance or liability incurred on account thereof, the wishes might fairly be presumed to be orders; and the noting the wishes, accordingly, an assent to follow them. But very different considerations might apply where the consignment should be, as the present is, one clothed with a special interest and a special property, founded upon advances and liabilities. We think, therefore, that this objection is not, under the circumstances of the case, maintainable. It would be quite another question, whether the Court might not in its discretion have assumed upon itself the right and duty of construing these letters. There is no novelty in this doctrine. It will be found recognised in Ekins vs. Macklish, Ambler Rep. 184, 185. Lucas vs. Groning, 7 Taunt. Rep. 164; and Rees vs. Warwick, 2 Barn. and Ald. 113. 115.

But the main objection to the instruction is of a more broad and comprehensive character. The instruction in effect decides that in the case of a general consignment of goods to a factor for sale, in the exercise of his own discretion, as to the time and manner of sale, the consignor has a right, by subsequent orders, to suspend or postpone the sale at his pleasure; notwithstanding the factor has, in consideration of such general consignment, already made advances, or incurred liabilities for the consignor, at his request, trusting to the fund for his due reimbursement. We are of opinion that this doctrine is not maintainable in point of law. We understand the true doctrine on this subject to be this: Wherever a consignment is made to a factor for sale, the consignor has a right, generally, to control the sale thereof, according to his own pleasure, from time to time, if no advances have been made or liabilities incurred on account thereof; and the factor is bound to obey his orders. This arises from the ordinary relation of principal and agent. If, however, the factor

makes advances, or incurs liabilities on account of the consignment, by which he acquires a special property therein; then the factor has a right to sell so much of the consignment as may be necessary to reimburse such advances or meet such liabilities; unless there is some existing agreement between himself and the consignor, which controls or varies this right. Thus, for example, if contemporaneous with the consignment and advances or liabilities there are orders given by the consignor which are assented to by the factor, that the goods shall not be sold until a fixed time, in such a case, the consignment is presumed to be received by the factor subject to such orders; and he is not at liberty to sell the goods to reimburse his advances or liabilities, until after that time has elapsed. The same rule will apply to orders not to sell below a fixed price; unless, indeed, the consignor shall, after due notice and request, refuse to provide any other means to reimburse the factors. And in no case will the factor be at liberty to sell the consignment contrary to the orders of the consignor, although he has made advances, or incurred liabilities thereon; if the consignor stands ready, and offers to reimburse and discharge such advances and liabilities.

On the other hand, where the consignment is made generally, without any specific orders as to the time or mode of sale, and the factor makes advances or incurs liabilities on the footing of such consignment, there the legal presumption is, that the factor is intended to be clothed with the ordinary rights of factors to sell in the exercise of a sound discretion, at such time and in such mode as the usage of trade and his general duty require; and to reimburse himself for his advances and liabilities, out of the proceeds of the sale: and the consignor has no right, by any subsequent orders, given after advances have been made or liabilities incurred. by the factor, to suspend or control this right of sale, except so far as respects the surplus of the consignment, not necessary for the reimbursement of such advances or liabilities. Of course, this right of the factor to sell to reimburse himself for his advances and liabilities, applies with stronger force to cases where the consignor is insolvent, and where, therefore, the consignment constitutes the only fund for indemnity.

Such then being the relative rights and duties of the parties, we are of opinion that the instruction given to the jury by the learned judge in the Circuit Court, is not maintainable in point of law. The consignment was general to the Liverpool house, for sale; the advances and liabilities were contemporaneous with the consignment; there were no contemporaneous orders limiting or qualifying the general rights of the factors resulting from these circumstances; the consignor, subsequently, either failed in business, or was believed to have failed; the wishes subsequently expressed by the letter of the 20th of April, even admitting them to have the force of orders, were unaccompanied with any other means of indemnity, or even with any offer of reimbursement of the advances or liabilities. Unless, then, upon the established principles of law, the consignor had a

clear right to control the sale of the consignment, by any orders which he might in his discretion choose to give, notwithstanding such advances and liabilities; which we are of opinion he had not; the instruction was erroneous.

We have not thought it necessary to enter upon any general examination of the authorities which support the doctrines which have been thus stated by us. But the opinion of Lord Chief Justice Gibbs, in Pothonier vs. Dawson, 1 Holt's Rep. 383, and the opinions of the judges in Graham vs. Dyster, 6 Maule and Selw. 1. 4, 5, will be found fully to recognise some of the leading principles.

Another instruction was given by the Court to the jury upon the question of damages, supposing the Liverpool house, by the sale, had violated their proper duty. It was, that if the jury found, from the evidence in the cause, that cottons were selling for a higher price from the 3d of June, 1833, when the draft was accepted, and when the cotton was sold, until the time when the said draft was mature and payable, and if the evidence in the cause ascertain at any time before the maturity of the draft, what such higher price was, and that the cotton belonging to the plaintiff could have been sold for such higher price; then the plaintiff was entitled to recover from the defendants the difference in price between the sum for which the defendants sold the cotton, and the sum at which it might have been sold before or at the maturity of the draft. This instruction was doubtless framed upon the ground that this was the claim of damages which the plaintiff asserted by his letter of the 30th of July, 1833. But as that letter was not assented to, or the claim recognised by the defendants, this claim could, in no just sense, be obligatory upon them; and as a general rule of law, applicable to damages under like circumstances, we think that it cannot be maintained.

Supposing the sale made by the defendants on the 3d of June to have been tortious, and in violation of orders, the plaintiff had his election either to claim damages for the value of the cotton on that day, as a case of tortious conversion, or for the value of the cotton on the 23d of August following, when the letter of the plaintiff of the 22d of July was received, which authorized a sale. If the price of cotton was higher on that day than at any intermediate period, he was entitled to the benefit thereof. If, on the other hand, the price was then lower, he could not justly be said to be damnified to any extent beyond what he would lose by the difference of the price of cotton on the 3d of June, and the price on the 23d of August.

For these reasons, we are of opinion, that both the instructions given by the Circuit Court to the jury were erroneous; and therefore the judgment ought to be reversed, and the cause remanded, with instructions to that Court to award a venire facias de novo.

Mr. Justice WAYNE, and Mr. Justice CATRON dissented.