FAGIN, Respondent, v. CONNOLY, Appellant.

1. Although, as a general rule, the interpretation of written instruments belongs to the court and not to the jury, the construction and true interpretation of commercial correspondence may, under proper circumstances, be properly left to the consideration of the jury.

*Appeal from St. Louis Circuit Court.*

*Knox & Kellogg,* for appellant.
*Hitchcock,* for respondent.

RYLAND, Judge, delivered the opinion of the court.

Fagin, a miller in the city of St. Louis, shipped to Connoly & Co., who were his factors at the time in New Orleans, during the fall of the year 1853, quantities of flour for sale. Among the lots of flour thus sent were 1149 barrels of superfine. The flour was to be sold by defendants for the plaintiff Fagin, and under his directions. These 1149 barrels were in the possession of the defendants as factors and commission merchants of the plaintiff before the 5th of December, 1853, and so remained in their possession until the latter part of January, 1854, when the same were sold by the defendants for seven dollars per barrel, the then market price.

From the evidence presented by the bill of exceptions, it

appears that Fagin by a dispatch by telegraph, dated 5th December, 1853, instructed the defendants to hold his flour at seven dollars for superfine, and extra flour in proportion; that after receipt of this dispatch the defendants wrote to Fagin at different dates advising the plaintiff to leave them to sell his flour without any limit as to price, trusting to their discretion. On the 13th of December, 1853, the plaintiff wrote to defendants and removed all limits as to his flour, hoping that they would do ample justice to him in closing sales, and requesting them to close the plaintiff's business as soon as practicable. The court, who tried the case without a jury, found as a fact that this letter revoked all previous limits on the flour of plaintiff in the hands of defendants. This letter was received by defendants. The usual course by mail required about eight days. On the 21st of December, 1853, Fagin sent a dispatch by telegraph to defendants, which was received by them the same day or the next day, instructing them to hold his superfine flour and retail his extra flour. The defendants did hold his superfine flour until the 17th day of January, 1854, on which day, and on the following days up to the 20th of the same month, they sold the superfine flour of the plaintiff at seven dollars per barrel—the whole lot of 1149 barrels. This was done without any order from the plaintiff after the dispatch of the 21st of December. On the 31st of January, 1854, the plaintiff sent a dispatch by telegraph to defendants directing them to sell his flour after the receipt of the " Atlantic's" news. This dispatch was received by defendants on the 1st of February, 1854; and on the same day the " Atlantic's" news was published in New Orleans. The market price for superfine flour in New Orleans on that day and a few succeeding days was from $7.75 to $7.87½ per barrel. The flour would have realized in market, if it had been retained under the plaintiff's dispatch until the 1st of February, 1854, not less than seventy-five cents per barrel net more than the price at which it was previously sold.

Now the question here which was submitted to the court

below for trial was, whether the defendants had sold the plaintiff's flour contrary to orders; and the construction of the dispatch and letters on this subject was necessary to a proper solution of this question. In this case the meaning or construction of the dispatches has been found by the court as a fact in the same manner as the jury would have found facts.

In Brown & Co. v. McGran, 14 Peters, 493, Mr. Justice Story, in delivering the opinion of the court, said: "It is certainly true as a general rule, that the interpretation of written instruments properly belongs to the court and not to the jury; but there certainly are cases in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury for the purpose of carrying into effect the real intention of the parties. This is especially applicable to cases of commercial correspondence, where the real objects and intentions and agreements of the parties are often to be arrived at only by allusions to circumstances which are but improperly developed. McGran, in the letter of the 20th April, says that 'he wishes the defendants to hold any cottons on hand until they hear from him again.' Now this language certainly ordinarily imports only a desire, and not an order, and yet there can be no reasonable doubt that, under particular circumstances, a wish expressed by a consignor to a factor may amount to a positive command. So in the reply of 24th May the defendants say: 'Your wishes in respect to the cotton we now hold on your account are noted accordingly.' Here again the point is open whether the language imports that the defendants construed the wishes of the plaintiff to be simply a strong expression of desire or opinion, or a positive order; and also whether the words 'noted accordingly' import that the defendants took notice thereof, or took notice of, and assented to obey, the wishes or order of the plaintiff." In Lucas v. Groning, 7 Taunt. 164, the meaning of the expression, "*please to give them credit in exchange when the bills were duly honored*," became important to be

ascertained. Gibbs, Ch. Justice, said: "This was a question singularly fit for a jury, and one on which they were likely to arrive at a sounder conclusion than the court, because their knowledge of it arises from their daily experience. But the question whether the phrase, "*when duly honored*," means when they were accepted, or when they were paid, was a question not so much for the consideration of a court as of a jury." Park, J., said: "The solicitor general argues that the phrase 'duly honored' means *accepted*. Whether it does so or not, has been left to the jury, and they have found that it meant *payment*, which is the opinion I should myself have formed." In Rees v. Warwick, 2 Barn. & Ald. 113, the meaning of the words, "Your bill of £100, in favor of W. Johnson & Co., *shall have attention*," was left to a jury to be ascertained; and they by no means thought that the words, "shall have attention," were clearly and unequivocally an acceptance of the bill. What is the true interpretation of mercantile phrases, in such instructions or orders, is not always a question of law, but may in many cases be properly left to a jury to decide, where the phrases admit of different meanings. (Story on Agency, § 75.)

Under the principles contained in the above cases, and according to the authority above cited, the meaning of the dispatches and instructions given by plaintiff to defendants was not so much for the consideration of the court as a matter of law, as for the consideration of a jury. Here the court, sitting as a jury, found the meaning of these dispatches, and, according to such meaning, the defendants sold the flour contrary to orders, and are liable to plaintiff for the injury arising from such breach of orders. If the meaning of the dispatches was in so much doubt, or if this court might have found differently even from the court below, still that will not warrant our interference with the finding, where it might have been, from the evidence, either way. The construction of the dispatches not being a mere question of law, but more a question of fact, we can not as a matter of law say the court below erred.

From a careful examination of the evidence preserved in the record, I am satisfied with the finding of the court below, and entertain not the slightest doubt that the sale of the 1149 barrels of superfine flour was made against express directions. The whole correspondence between these parties warrants that conclusion. Here the superfine flour was under a limit—$7. The defendants wrote to plaintiff advising him to remove all limit and leave the flour in their hands free to be sold at their discretion. He answers this letter, removing all limits. This answer reaches the defendants, but not before the telegraphic dispatch ordering them to "hold superfine, and retail extra." The telegraphic dispatch is dated 21st—the letter removing limits is dated 13th December. Now no matter what the defendants might have supposed to be the meaning of the dispatch, the moment they got the letter they would then see that Fagin sent the dispatch to do away with what he might suppose would be the effect of his letter on the superfine flour. He had removed all limits. He then withdrew from market his superfine flour by his dispatch—waiting for a better market ahead. The defendants had no right to suppose the dispatch was the answer of Fagin to their letter asking to withdraw all limit on the price of the flour, after they received his letter expressly purporting to answer it. They should have examined the dates of the letter and the dispatch, and then I think that there could have been no mistake about the intentions of Fagin. After Fagin's dispatch ordering defendants to "hold superfine and retail extra," if the market had risen to ten dollars per barrel, they had no right to sell the superfine without further orders from Fagin. The withholding the superfine was not until at a certain price in market, but must mean until further orders. The judgment will be affirmed; the other judges concurring.