GUNN *v.* WHITE SEWING MACHINE CO.

Opinion delivered December 3, 1892.

*Interstate commerce—Right of foreign corporation to do business in State.*
Where a resident of a State contracts with a foreign corporation
to canvass certain territory for the sale of its goods which the
corporation agrees to sell to him on credit, a bond given to
secure payment to the corporation of any sum that may become
due under such contract constitutes a part of the inter-state
commerce carried on by the sale of the goods, and cannot be
affected by a State statute prohibiting business within the
State by a foreign corporation which has not complied with
certain requirements, such as filing a certificate to designate
an agent on whom process may be served.

Appeal from Faulkner Circuit Court.

JOSEPH W. MARTIN, Judge.

Suit was instituted February 14, 1890, by the White
Sewing Machine Company, an Ohio corporation, against
N. H. Gunn to recover upon a bond executed by A. I.
Julian, with Gunn as surety, conditioned that Julian
would pay any indebtedness to the company which might
thereafter arise out of the purchase or sale of sewing
machines or otherwise, under a contract of the same
date, wherein the company agreed to sell their machines
to Julian at stipulated prices on credit, and Julian agreed
to canvass Faulkner county, or to have it canvassed, for
the White sewing machine.

The defense was that plaintiff was a foreign cor-
poration carrying on business in Arkansas, and had not
filed any certificate under the hand of the president and
seal of the corporation, in the office of the Secretary of
State of Arkansas, designating an agent upon whom ser-
vice of process might be had, and stating the principal
place of business of the corporation in the State ; that

the bond in suit was executed in Arkansas by a citizen of Arkansas.

There was but one witness, S. B. Kirby, whose testimony was as follows :

"I live in Little Rock, Arkansas; I am the agent of the plaintiff, the White Sewing Machine Company, which is a corporation organized under the laws of Ohio, with its principal or home office in Cleveland, in that State. I commenced working for plaintiff in June, 1888. My duties as the representative of the plaintiff in this State are to secure the services of agents in different parts of the State to whom machines are furnished to sell in designated territories. These agents are required to give bond with security, to secure the company against loss on account of machines furnished them. One of these agents was A. I. Julian, and he gave bond with the defendant, N. H. Gunn, as surety. I here introduce the bond in evidence, which is in words and figures as follows :

"'Know all men by these presents : That A. I. Julian, of Wooster, and N. H. Gunn, of Greenbriar, Ark., are hereby held and firmly bound, severally and individually, unto the White Sewing Machine Company, in the sum of five hundred dollars, lawful money of the United States of America, to be paid to the White Sewing Machine Company, their representative or assigns, for which payment (together with ten per cent. thereon in case of suit upon this bond), well and truly to be made, they bind themselves, their heirs, executors and administrators, and separate estate, jointly and severally, firmly by these presents. Sealed with their seals. Dated the sixth day of August, one thousand, eight hundred and eighty-eight.

"' The condition of the above obligation is such, that if the above bounden A. I. Julian and N. H. Gunn, heirs, executors or administrators, shall well and truly pay,

or cause to be paid, any and every indebtedness or liability now existing, or which may hereafter in any manner exist or be incurred on the part of the said A. I. Julian to the White Sewing Machine Company or its assigns, whether such indebtedness shall exist in the shape of book accounts, notes or leases, renewals or extensions of notes, accounts or leases, acceptances, indorsements, consignments of property or merchandise, failure to deliver or account for the same, or any part thereof or otherwise, and whether such indebtedness shall be incurred under any contract between said White Sewing Machine Company and said A. I. Julian or otherwise, and whether the same shall arise out of the purchase and sale of sewing machines or otherwise, hereby waiving presentment for payment, notice of, non-payment, protest and notice of protest, and diligence upon all notes, accounts or leases, now or hereafter executed, indorsed, transferred, guaranteed or assigned by the said A. I. Julian to the White Sewing Machine Company, its agents or assigns, then this obligation to be void; but otherwise to be and remain in full force and effect.

" 'Each one signing this bond is bound according to the purport of it, without any regard to any understanding that any person should also sign this instrument; and the person to whom this is intrusted has absolute authority to deliver it, and the same is made and shall be construed without reference to any other instrument or agreement whatever. It is further understood, and the undersigned hereby agree and consent that the White Sewing Machine Company or its agent may, in their discretion, take or receive from said A. I. Julian any security whatever, mortgage, personal or other property at any time or times, and grant any extension to said A. I. Julian, or release, cancel or discharge any security which they may have taken, without in any way

affecting the liability of the signers hereto, or either of them, from the obligation of this bond.'

(Here follow signatures.)

"When I secured the services of A. I. Julian, he entered into the following contract with the plaintiff, which I here introduce in evidence, and which is in words and figures as follows :

" 'Articles of agreement, by and between White Sewing Machine Company, party of the first part, and A. I. Julian, Wooster, Faulkner county, Arkansas, party of the second part, in terms as follows : The party of the first part agrees : *First*, to sell White sewing machines to the said party of the second part at the following prices, viz.: (Here follow prices of machines). *Second*, to give territory wherein the second party shall sell the White sewing machines, as follows : In Faulkner county, Arkansas. The party of the second part, first to order, accept and pay for White sewing machines upon the terms and conditions as above provided, or as hereinafter set forth, and machines sold by the first party to second party for sales elsewhere than in said territory, shall, unless otherwise agreed, be accepted and paid for upon the same terms and conditions. It is understood and agreed by all parties hereto that the terms of payments for the White sewing machines, accessories and parts, and other forms of indebtedness, shall be as follows : The first party shall keep a book account of all indebtedness due it from the second party, and on or before the twelfth of each month a statement of such indebtedness shall be sent to the party of the second part who shall, within thirty days, give a promissory note for the amount therein stated, payable in six months from the date of said statement ; also, if the second party so chooses, the amount due the first party, as specified in aforesaid statement, may be paid in lawful money of the

United States of America, within thirty days from the date of said statement, less a discount of five per cent. Said second party to canvass, or have canvassed, said Faulkner county, Arkansas, with horse and wagon, for the sale of the White machine, exclusively of any other makes or makers.  This agreement to take effect from and after the 6th day of July, 1888, and continue in force until dissolved by mutual consent ; but it may be dissolved by either party giving thirty days' notice, or, in case of a violation of this agreement by the second party, the first party may cancel it, if it so chooses, without notice.'  .

(Here follow signatures of the parties).

"A. I. Julian at this time owes the plaintiff over sixteen hundred dollars.   We had agents in thirty or forty counties in this State between June, 1888, and November 16, 1889, and in that time had as many as seventy-five or eighty bonds like the one sued on here, taken for the company, and plaintiff also had that many contracts with its agents, all of which are like the contract heretofore introduced in evidence ;   I negotiated these contracts, looked after getting the bonds and collected claims due the company. The last item on account of plaintiff against Julian which the bond sued on secures was obtained November 6, 1891 ; the above bond and contract were both signed in Arkansas ; Julian and Gunn are both citizens of Faulkner county, Arkansas, and were at the time the contract and bond were executed, between June 1888 and November 1889 ; plaintiff sold in Arkansas probably two thousand machines, and between these dates this contract and bond sued on were executed.

"On the 16th day of November, 1889, the plaintiff filed in the office of the Secretary of State of Arkansas a certificate under its seal and the hand of its president, designating me as its agent for Arkansas, and Little Rock as its principal place of business in the State ; no

certificate of any kind had been filed prior to that time. The parties referred to in my original testimony as 'agents' are the parties who purchased the goods from plaintiff, and to whom they were shipped as their own goods, and not those of the plaintiff, as shown by their contracts, all like the one herein exhibited."

This was all the evidence in the case.

The cause being submitted by consent to the court sitting as a jury, the court found the facts to be, that plaintiff is a corporation organized and doing business under the laws of the State of Ohio, and its place of business and manufactory is located at Cleveland, Ohio. The defendant is a citizen of Faulkner county, Arkansas, as is also the principal (Julian) on the bond. The bond was made for securing the plaintiff in goods sold and shipped, and to be shipped from time to time to said Julian. Kirby was the agent of plaintiff in Arkansas for making and forwarding contracts, such as exhibited in the case, to the home office at Cleveland, when the contract, if disapproved, was returned to the parties, and, if approved, was accepted and thereby made a contract for shipment between the parties, and goods were sold and shipped under this contract to Julian. When so shipped into the State and delivered, they became and were the goods of Julian. At the time of suit brought, Julian's indebtedness was over fifteen hundred dollars, largely more than the face of the bond. This bond was given to secure this indebtedness. The plaintiff was a foreign corporation, and at time of maturity of this debt had never filed the certificate as required by statute of our State. The certificate was filed November 16, 1889.

Upon the state of facts, the court declared the law to be for the plaintiff; that this business carried, as shown by the facts, was of the character of inter-state

commerce, and the company would not be bound by the regulation imposed by State law as to such business.

Judgment was accordingly entered for the amount sold for.

Defendant has excepted and appealed.

*J. H. Harrod* and *E. A. Bolton* for appellant.

The act of April 4th, 1887 (Acts 1887, p. 234), was designed to carry into effect the mandate of the Constitution. Art. 12, sec. 11, Const. 1874. Its intention was to place the citizen upon an equality with the foreign corporation that seeks to do business with the citizen. It is claimed the act is inoperative :

*First.* Because the appellee was not carrying on business in Arkansas within the meaning of this act.

*Second.* Because the requirements of the act would constitute a prohibited interference with inter-state commerce, and the act is therefore unconstitutional as conflicting with the Federal Constitution.

1. The proof shows that appellant had been doing business in this State.

2. The act is not an interference with inter-state commerce. Legislation by a State will not be restrained except when the exercise of the right conflicts with the perfect execution of a sovereign power delegated to the United States. 16 Peters, 435. The act imposes no tax, requires no license and in no way discriminates against foreign corporations, but rather seeks to place foreign and domestic corporations on the same level. No fee or compensation is required to be paid, and the act in no way prohibits commerce among the States. Morawetz on Priv. Corp. Vol. 2, sec. 974.

*Sanders & Watkins* for appellee.

1. A corporation carrying on the character of business in this State as appellee is not required to comply with the act. It was not *doing business* in this State.

113 U. S. 727 ; 5 Hill, 490 ; 16 Pac. Rep. 605. As to
what constitutes commerce see 114 U. S. 195 ; 5 Sup. Ct.
Rep. 826 ; 8 Wall. 168 ; 91 U. S. 275 ; 102 *id.* 691 ; 116
*id.* 446. The non-action by congress is equivalent to a
declaration by that body that such commerce shall
remain free.

2. But if such dealings by appellee be "carrying
on business," then the act is an interference with com-
merce between the States, and therefore unconstitu-
tional. See cases *supra* and 114 U. S. 196 ; 2 So. Rep.
592 ; 26 Fed. Rep. 889 ; 23 *id.* 469 ; 102 U. S. 702.

BATTLE, J. The White Sewing Machine Company
was a corporation organized and doing business under
the laws of the State of Ohio, and was engaged in the
selling of sewing machines and other goods at Cleve-
land, in that State. A. I. Julian and N. H. Gunn were
citizens of Faulkner county, in this State. On or about
the 6th day of August, 1888, the Sewing Machine Com-
pany entered into a contract with Julian, by which the
company undertook and bound itself to sell sewing
machines and the component parts thereof to Julian at
stipulated prices, on a credit, and Julian agreed to can-
vass Faulkner county or cause it to be canvassed " with
horse and wagon, exclusively, for the sale of the White
sewing machines." Julian was to order the machines,
or the component parts of the same, when he desired
them to be sent to him. At the same time Julian, as
principal, and Gunn, as surety, executed a bond to the
Sewing Machine Company, conditioned, among other
things, that Julian would pay all sums of money that
he would be owing to the company for sewing machines
or otherwise. After this the company, pursuant to the
terms of its contract and on the faith of the bond exe-
cuted to it, sold and shipped to Julian a large number of
sewing machines and other property, and Julian became
indebted to it on account thereof in a large sum of

money. Julian failing to pay, the company brought this action on the bond against Gunn to recover the same, or a part thereof.

The only defense made by Gunn was, the company had not, at the time the bond was executed, filed any certificate in the office of the Secretary of the State of Arkansas, designating an agent upon whom process could be served, and its principal place of business in this State.

Evidence was, however, adduced at the trial tending to prove, among other things, the facts before stated, and that the machines and other property were sold by the company in Ohio and shipped to Julian in this State. The court below held that these transactions were a part of the inter-state commerce of the United States, and were not affected by the laws of this State, and rendered judgment in favor of plaintiff against the defendant, and he appealed.

Appellant contends that the bond sued on is void under the act of the general assembly of April 4th, 1887. That act declares that, before any foreign corporation shall begin to carry on business in this State, it shall, by a certificate under the hand of the president and seal of such company, filed in the office of the Secretary of State, designate an agent, who shall be a citizen of the State, upon whom process may be served, and also state therein its principal place of business in this State ; and provided that if any such corporation shall fail to file such certificate, all its contracts with citizens of this State shall be void as to the corporation, and shall not be enforced in any of the courts of this State in favor of the corporation.

It is conceded that the certificate required by that act was not filed by the appellee until after the debt sued on matured. Was the bond void ?

In *Paul* v. *Virginia*, 8 Wall. 168, the court, speaking of a foreign corporation, said : " The recognition of its existence even by other States, and the enforcement of its contracts made therein, depend purely upon the comity of those States—a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy.   Having no absolute right of recognition in other States, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those States may think proper to impose.   They may exclude the foreign corporation entirely ; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest.   The whole matter rests in their discretion."

But this right of the State cannot be so exercised as to interfere with the power of Congress to regulate inter-state commerce.   In *Paul* v. *Virginia* the corporation involved in litigation was an insurance company, and was not engaged in inter-state commerce.   In speaking of the power to regulate commerce, in that case, the court further said :   "It is undoubtedly true, as stated by counsel, that the power conferred upon Congress to regulate commerce includes as well commerce carried on by corporations as commerce carried on by individuals. * * * This state of facts forbids the supposition that it was intended in the grant of power to Congress to exclude from its control the commerce of corporations. The language of the grant makes no reference to the instrumentalities by which commerce may be carried on ; it is general, and includes alike commerce by individuals, partnerships, associations, and corporations."

In *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, the court, speaking of inter-state commerce, said : " The power to regulate that commerce, as well as commerce with foreign nations, vested in Congress, is the power to prescribe the rules by which it shall be governed, that is, *the conditions upon which it shall be conducted;* to determine when it shall be free and when subject to duties or other exactions. The power also embraces within its control all the instrumentalities by which that commerce may be carried on, *and the means by which it may be aided and encouraged.* The subjects, therefore, upon which the power may be exerted are of infinite variety. While with reference to some of them, which are local and limited in their nature or sphere of operation, the States may · prescribe regulations until Congress intervenes and assumes control of them ; yet, when they are national in their character, and require uniformity of regulation affecting alike all the states, the power of Congress is exclusive. * * *. Nor does it make any difference whether such commerce is carried on by individuals or by corporations."

In *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. 181, the court, after discussing this power at length, said : " The only limitation upon this power of the State to exclude a foreign corporation from doing business within its limits, or hiring offices for that purpose, or to exact conditions for allowing the corporation to do business or hire offices there, arises where the corporation is in the employ of the federal government, or where its business is strictly commerce, inter-state or foreign. The control of such commerce, being in the federal government, is not to be restricted by State authority." *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.* 96 U. S. 1 ; *Cooper Manufacturing Co.* v. *Ferguson*, 113 U. S. 727.

In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, the court said:   " Certain principles have been already established by the decisions of this court which will conduct us to a satisfactory decision.    Among those principles are the following:    (1).   The Constitution of the United States having given to Congress the power to regulate commerce, not only with foreign nations, but among the several States, that power is necessarily exclusive whenever the subjects of it are national in their character, or admit only of one uniform system, or plan of regulation.   *   *   *   *   (2).   Another established doctrine of this court is, that where the power of Congress to regulate is exclusive, the failure of Congress to make express regulations indicates its will that the subject shall be left free from any restrictions or impositions ; and any regulation of the subject by the States, except in matters of local concern only, as hereafter mentioned, is repugnant to such freedom."

" Of the former class may be mentioned all that portion of commerce with foreign countries or between the States which consists in the transportation, purchase, sale, and exchange of commodities.   Here there can of necessity be only one system or plan of regulations, and that Congress alone can prescribe."   *County of Mobile* v. *Kimball*, 102 U. S. 691; *Escanaba Co.* v. *Chicago*, 107 U. S. 678.

" Of the class of subjects local in their nature, or intended as mere aids to commerce," on which it has been held that the authority of the States may be exerted for their regulation and management until Congress interferes and supersedes it, "may be mentioned harbor pilotage, buoys, beacons to guide mariners to the proper channels in which to direct their vessels," bridges over navigable streams, wharfs, wharfage, and quarantine.   "State action upon such subjects," said the court, in *County of Mobile* v. *Kimball*, 102 U. S.

691, "can constitute no interference with the commercial power of Congress, for when that acts the State authority is superseded. Inaction of Congress upon these subjects of a local nature or operation, unlike its inaction upon matters affecting all the States and requiring uniformity of regulation, is not to be taken as a declaration that nothing shall be done in respect to them, but is rather to be deemed a declaration that for the time being, and until it sees fit to act, they may be regulated by State authority."

A few cases will serve to show the character of some of the statutes which have been held by the courts to be unconstitutional because they interfered with the exclusive power of Congress to regulate inter-state commerce, and thereby what constitutes, in part, the commerce over which such power extends. In *Hall* v. *De Cuir*, 95 U. S. 485, a statute of the State of Louisiana, which attempted to regulate the carriage of passengers upon railroads, steamboats and other public conveyances, and which provided that no regulation of any companies engaged in that business should make any discrimination on account of race or color, was considered. The case presented under the statute was that of a person of color who took passage from New Orleans for Hermitage, both places being within the limits of the State of Louisiana, and was refused accommodations in the general cabin on account of color. In regard to this the court declared that, "for the purposes of this case, we must treat the act of Louisiana of February 23, 1869, as requiring those engaged in inter-state commerce to give all persons traveling in that State upon the public conveyances employed in such business, equal rights and privileges in all parts of the conveyance, without distinction or discrimination on account of race or color. * * * We have nothing whatever to do with it as a regulation of internal commerce, or as affecting anything else than commerce among

the States." And, speaking in reference to the right of the States in certain classes of inter-state commerce to pass laws regulating them, the court said : "The line which separates the powers of the States from this exclusive power of Congress is not always distinctly marked, and oftentimes it is not easy to determine on which side a particular case belongs. * * * But we think it may safely be said that State legislation which seeks to impose a direct burden upon inter-state commerce, or to *interfere directly with its freedom*, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position. It does not act upon the business through the local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from without or goes out from within. While it purports only to control the carrier when engaged within the State, it must necessarily influence his conduct to some extent in the management of his business throughout his entire voyage."

In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, the taxing district of Shelby county, Tennessee, which included the city of Memphis, acting under the authority of a statute of that State, attempted to impose a license tax upon a drummer for soliciting, within that district, the sale of goods for a firm in Cincinnati which he represented ; but the court decided that such a soliciting of business constituted a part of inter-state commerce, and that the statute of Tennessee imposing a tax upon such business was in conflict with the commerce clause of the Constitution of the United States, and was therefore void.

In *McCall* v. *California*, 136 U. S. 104, the plaintiff in error was convicted of violating an order of the city and county of San Francisco, in the State of California, which made it a misdemeanor for any one to act as an

agent of a railroad company without having first paid the sum of twenty-five dollars as a license fee. He was an agent in said city and county for the New York, Lake Erie and Western Railroad Company, a corporation having its principal place of business in the city of Chicago, and which operated a continuous line of road between Chicago and New York. As such agent his duties consisted in soliciting passenger traffic in that city and county over the road he represented. He did not sell tickets for his company; neither did he receive nor pay out money on account of it. His sole offense consisted in soliciting passengers to go over his company's road, without having paid the license tax imposed upon him by said order as a condition precedent to his right to act as such agent in said county. The court held that the license fee as to such agency was a tax upon inter-state commerce, and in that respect was unconstitutional. The court, speaking of the agency and tax, said: "The object and effect of his soliciting agency were to swell the volume of the business of the road. It was one of the '*means*' by which the company sought to increase and doubtless did increase its inter-state passenger traffic. It was not incidentally or remotely connected with the business of the road, but was a direct method of increasing that business. The tax upon it, therefore, was, according to the principles established by the decisions of this court, a tax upon a means or an occupation of carrying on inter-state commerce, pure and simple."

In this case the contract between the corporation and Julian and the bond sued on were executed in this State and were business transacted in Arkansas. But no sales or indebtedness were created by them. The contract was only an agreement to sell, and the bond was a condition upon which the corporation agreed to sell and a means adopted to secure the indebtedness to

be contracted by sales, and both constituted a contract. They were made a foundation of a future trade between a corporation of one State and a citizen of another and were a direct method devised to increase the business of the former, and as to them served as a basis of inter-state commerce.  Relying on them the corporation sold the machines and other property and shipped them from the State of Ohio, its place of manufacture and business, to Julian in Arkansas, the place of sales being in Ohio. Until they ceased, according to their terms or by agreement of the parties, to be of any force, they were an inducement to, and entered into, every sale and formed a part of it.  According to the principles firmly established by numerous decisions of the Supreme Court of the United States, they (the bond and contract) the sales and shipment of the machinery and other property were a part of the inter-state commerce of the United States, which Congress has the exclusive right to regulate, and were not and could not be affected by the act of April 4th, 1887.

Judgment affirmed.

COCKRILL, C. J., dissenting.   Two propositions have been concurred in by a majority of the judges in this cause :   1st, it was agreed, that the White Sewing Machine Company, an Ohio corporation, had begun to carry on business in this State without designating an agent upon whom service could be had when the contract sued on was made ; and 2d, that the statute imposing a penalty upon foreign corporations for doing business under such circumstances was inoperative in this case because of the commerce clause of the Constitution of the United States.

I concur as to the first proposition and dissent as to the second.

A corporation created under the laws of one State has no right to recognition in another State—that is a

privilege to be enjoyed only through comity. Having the absolute power of excluding it from its jurisdiction, the State may, of course, impose such conditions upon the privilege of doing business in its limits as it may think expedient. This doctrine went without qualification for more than three-fourths of a century after the adoption of the Constitution of the United States, when the Supreme Court of the United States engrafted upon it an exception in favor of foreign corporations which were agencies of commerce. The exception was first adverted to in *Paul* v. *Virginia*, 8 Wallace, 168. But what was said there was confessedly *obiter*, and established nothing. It has been said by judges delivering the opinions of that court that the exception was first established in *Pensacola Tel. Co.* v. *Western Union Tel. Co.* 96 U. S. 1, in 1877. See *Horn Silver Mining Co.* v. *N. Y.* 143 U. S. 305 and 314; *Pembina Mining Co.* v. *Pa.* 125 *id.* 181, 185.

But Chief Justice Waite, who delivered the opinion in that case, seems not to have been aware that he was deciding the question, for, after quoting the *obiter* in *Paul* v. *Virginia*, above mentioned, he says "the questions thus suggested need not be considered now," and gives as a reason for it the fact that the court had placed the invalidity of the State statute under consideration upon the ground that it conflicted with legislation of Congress. I am aware of no case in which it has been ruled that the exception applies to a foreign corporation which is not itself an agency of commerce. There are *dicta* which may go further, but there are also expressions of the court so pointed as to indicate that the exception is limited to such corporations as are agencies of commerce—as carriers of freight, passengers or communications. Thus, in *Pembina Mining Co.* v. *Pa.* 125 U. S. 185, Judge Field, who first gave expression to the exception, in speaking of the case of *Pensacola Tel. Co.*

v. *Western Union Tel. Co.* 96 U. S. *sup.*, said it was
there held that the telegraph *as an agency of commerce*
and intercommunication came under the controlling power
of Congress, and could not be excluded by a State from
transacting its business within its limits.   And again in
the same case he says the exception extends only to a for-
eign corporation in the employ of the Federal Government,
"or where its business is *strictly commerce.*"   The same
language is quoted with approval through Judge Lamar
in *McCall* v. *California*, 136 U. S. 112.

In *Crutcher* v. *Kentucky*, 141 U. S. 47, Judge Brad-
ley, after saying that a State could not restrict the right
of a foreign corporation where "the principal object of
its organization" was "the business of carrying on
inter-state commerce" said :   "The case is entirely
different from that of * * manufacturing corporations,
and all other corporations whose business is of a local
and domestic nature."

If we concede that the extreme doctrine of *Robbins*
v. *Taxing Dist.* 120 U. S. 489, must be extended to
foreign corporations, the conclusion does not follow that
such a corporation engaged in inter-state trade—as sel-
ling merchandise—can gain a domicile in a State in
violation of its statutes merely to gain a vantage ground
for the sale of its goods.   No method thereafter devised
to increase the business of the corporation can exempt
it from State control.

A manufacturing corporation is connected with com-
merce; for, if it cannot sell, its output is worthless.
Many manufacturing corporations would suspend opera-
tions if their sales were limited to the State creating
them.   They are then in a measure connected with
inter-state commerce.   But the connection with com-
merce must be direct in order to work an inhibition
of State action.   It is not sufficient that the business is

remotely or incidentally connected with inter-state or foreign commerce.

State legislation which operates upon natural persons and corporate agencies of commerce is not invalidated by the commerce clause of the Constitution, unless it directly affects commerce. *Sherlock* v. *Alling*, 93 U. S. 99, 102; *Smith* v. *Ala.* 124 *ib.* 474.

The rule governing ordinary corporate business cannot be more rigid against the State's right of regulation or prohibition. In *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. *sup.*, State legislation was upheld restricting the privilege of a foreign mining company from maintaining an office in Pennsylvania, notwithstanding the maintenance of the office in that State afforded the corporation the opportunity for the sale of its foreign products. So in the *Horn Silver Mining Co.* v. *N. Y.* 143 U. S. *sup.*

Following the decisions of the Supreme Court of the United States upon the question of inter-state commerce, the only question in this case open to serious consideration, in my judgment, is, did the White Sewing Machine Company do business in this State? or, to put the question as Judge Field does in the case of *Horn Silver Mining Co.* v. *N. Y.* 143 U. S. *sup.*, did the company do business *as a corporation* in this State? If so, it must submit to any condition the State sees fit to impose upon it. Any other rule would bind the hands of the State authorities, only to subject the public to all the corporate abuses now known or hereafter to be devised. The statement of such a doctrine is startling.

This case does not stand upon a single casual transaction in Arkansas, followed by contracts for sales of merchandise which were consummated in Ohio. Nor was the contract which the corporation entered into with Julian, for whom the appellant was surety, simply an agreement to sell merchandise. If those were the only

facts in the case, it might be gravely doubted whether the corporation had done business in Arkansas, within the meaning of our Constitution and statute.

It has been ruled by the Supreme Court of the United States that a foreign corporation does not by doing a single act of business in one State, with no purpose of doing other acts there, come within the prohibition of a Constitution and statute, which are substantially like our own. *Cooper Mfg. Co.* v. *Ferguson,* 113 U. S. 727. See *Scruggs* v. *Scottish Mortgage Co.* 54 Ark. 566.

And a merchant in Ohio who fills orders for merchandise received from a customer in Arkansas cannot be said to be doing business in the latter State. If neither the one nor the other constitutes carrying on business in Arkansas, it is difficult to see how the two together could make out the case. If they do not, and there were no other facts in the record, no question of conflict between the statute and the commerce clause of the Constitution would be presented, and the discussion of it by the court would be *obiter.* But the record shows the following state of facts in this case : The White Sewing Company, an Ohio corporation, maintained a resident agent at Little Rock, in this State. The proof does not show that the agent held or sold any machines or other merchandise for the company. He traveled over the State and in the name of the company sold to individuals the exclusive right to vend its merchandise in a limited territory. The consideration for this exclusive privilege was a contract on the part of the vendee, binding himself to sell no other sewing machine, and to canvass the territory assigned to him in the interest of the White machine. The company also bound itself to sell the vendee White sewing machines upon terms fixed by the contract.

As a part of this contract the vendee was also required to enter into bond to the company with a surety

for the faithful payment of whatever indebtedness might be incurred by him to the corporation under the contract or by any other means, whether the same should arise out of the purchase and sale, or lease, of sewing machines, or the consignment of property or merchandise, or the failure to redeliver or account for the same to the corporation, or for indebtedness arising in any manner whatever.

A great number of such contracts were entered into before the corporation complied with the statute. After the one in suit was executed, the corporation complied with the law by filing a certificate designating the agent before mentioned as the person upon whom service might be had, and Little Rock as its principal place of business in Arkansas. The business continued as before. Julian signed one of these contracts and bonds with the appellant as surety, and purchased machines, as set out in my brother Battle's opinion. The suit is to recover upon the bond thus executed. It is upon the uncontroverted facts above stated that the court concludes that the corporation carried on business in Arkansas. This evidence does not show simply the case of a drummer soliciting contracts for purchase of merchandise, to be consummated in another State, as was the case of *Robbins* v. *Taxing District*, 120 U. S. 489. Nor the mere act of soliciting business for a foreign corporation and nothing more, as in the case of *McCall* v. *California*, 136 U. S. *sup.* It shows the intention of the foreign corporation to gain a domicile in Arkansas, and to carry on its business of selling, leasing and consigning machines here through local agents, as it was authorized to do in the State of Ohio. To ascertain whether the corporation did business in Arkansas, we are not required to limit our enquiry to the transaction with which the defendant alone is concerned. If it was carrying on a business in Arkansas before and after the transaction

with the defendant, it was competent for him to show that his transaction was of the general class. And when it is proved that the corporation has done acts here manifesting the intent to gain a domicile for the purpose of transacting its business, that is the beginning of its business here, and the contracts which manifest that intention are avoided by the statute. The instant the business is entered upon, the prohibition of the statute attaches, without waiting to see what the corporation will do next. Suppose the corporation had entered into a contract to hire an office in Arkansas, with the avowed purpose of establishing a domicile here. That would be sufficient proof of the beginning of business here, and as the statute prohibits it from beginning business here until it complies with the law, it could not enforce the contract. The opinion of the court seems to be based upon the theory that the statute cannot have operation because the transaction in suit, if isolated from the others, shows one connected transaction of inter-state commerce and nothing more ; but the argument is untenable, for when it is once established that the corporation is exercising its functions in a foreign State, as distinguished from the performance of mere commercial acts to be consummated in another State, it becomes subject to State regulation. *Horn Silver Mining Co.* v. *N. Y.* 143 U. S. *sup.*; *Baker* v. *State*, 44 Ark. 134.

That the acts of the corporation in this case are not mere commercial transactions of the character indicated, seems apparent. The sales by the corporation of exclusive territory within which the vendees might sell White sewing machines, and the covenant on their part that they would sell none other, are contracts executed and to be performed in Arkansas ; and if they have any connection with inter-state commerce, it is remote ; the terms of the contracts show that they relate, not only to domestic commerce, but to transactions having no con-

nection with commerce at all. The contract sued upon is one of suretyship, which, like the contract of insurance and indemnity, is not the subject of commerce. These matters were not transactions of inter-state commerce but were business transacted in the State independently of commerce. When the corporation conformed to the State law after the contract in question was made, it declared its domicile in Arkansas, and thereafter became subject of course to the operation of the statute; by continuing its business thereafter in identically the same manner as it had done before, we see its own conclusion as to the effect of its prior acts in giving it a domicile here, and do no injustice in giving those acts their legal effect. According to the decisions above cited, they rendered the corporation amenable to State regulation.

The defendant's cause might be rested here. But I think it may be fortified still further.

If the foreign corporation were strictly an agency of commerce, entering the State for the purpose of carrying on the business of inter-state commerce, I think it should be held that the regulation is not a restriction upon commerce. What is the regulation? It is that the foreign corporation doing business in this State shall make known its place of business here and designate the agent upon whom service shall be had. No license fee or tax is demanded of the corporation. Not even a fee for defraying the expense of the regulation is required. The regulation then is nothing more than that the corporation doing business here shall consent to be found here, and shall designate the officer upon whom service shall be had and where he may be found. In theory the domicile of a corporation is only in the State where it is created, and the general rule, in the absence of legislation, is that it can be found no where else. But when it sends its agents into a foreign State to transact its business, it is really as much represented by them there as in the

State of its creation.   It is competent for the legislature
of the foreign State to enact that personal service may
be had on the corporation by service on agents in its
borders who transact the company's business there.
The corporation doing business thereafter in the foreign
State is presumed to assent to that rule.   *American
Casualty Co.* v. *Lea*, 56 Ark. 539.

But it was found often inconvenient for the creditor
of the corporation to prove the agency of the person
served, and so, to make the matter simpler, some of the
States enacted that some particular State officer should
be authorized to receive service for the corporation.   That
is the law in this State as to insurance companies.   In
the same line, as to other corporations, it requires them
to designate a person who shall be its agent to receive
service.   That is fairer to the corporation than to compel
it to run the risk of having judgment rendered against
it by service on some one of a number of persons trans-
acting business for it, who may not have the interest of
the corporation enough at heart to notify it of the pen-
dency of the suit.   It is better for the creditor because
he is relieved of doubt as to the proper person upon whom
to get service.   To enforce the regulation, the penalty
of avoiding the contract made in violation of it is imposed.
That the regulation is reasonable and within the power
of the State has never been doubted.   *St. Clair* v. *Cox*,
106 U. S. 350 ; *Cooper Mfg. Co.* v. *Ferguson*, 113 *id.
sup.*

" Legislation, in a great variety of ways, may affect
commerce and persons engaged in it without constitu-
ting a regulation of it within the meaning of the Consti-
tution. * * * And it may be said, generally, that the leg-
islation of a State, not directed against commerce or any of
its regulations, but relating to the rights, duties, and lia-
bilities of citizens, and only indirectly and remotely
affecting the operation of commerce, is of obligatory

force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or inter-state." *Sherlock* v. *Alling*, 93 U. S. 99; *Nashville, etc. Ry.* v. *Alabama*, 128 *id.* 96; *L. R. & Ft. S. Ry.* v. *Hanniford*, 49 Ark. 291.

This legislation is not directed against commerce or any of its regulations, but relates only to the right of the citizen to sue in the jurisdiction where the cause of action arises, and imposes upon the corporation only the duty of submitting to that jurisdiction.

The domestic corporation is required to show by record where its principal place of business is, and the law specifies that service may be had on its officers. "It does not lie in any foreign corporation to complain that it is subjected to the same law as the domestic corporation." *Horn Silver Mining Co.* v. *N. Y.* 143 U. S. *sup.*

When a State no longer possesses the power to compel every corporation doing business within its jurisdiction, whether exclusively engaged in inter-state or foreign commerce or not, to give publicity to its affairs in so simple a matter as making known its officers and place of business, there will remain but little of value in its reserved rights.

I think the judgment should be reversed, and the complaint dismissed.

MANSFIELD, J.    I concur with the Chief Justice in dissenting, on the grounds stated in his opinion.