BALES v. NORTHWESTERN CONSOL. MILLING CO.

No. 2044, Okla. T.   Opinion Filed June 23, 1908.

(96 Pac. 599.)

1.  **TRIAL—Directing Verdict—Uncontroverted Issue.** In a suit on
account for a car of flour, where there was a plea of payment
and a cross-action in damages, alleging that the flour was un-
wholesome and defective, and its use by defendant was injurious
to his business as a baker, where the undisputed evidence was
sufficient to prove payment, it was error to refuse to instruct the
jury to find for defendant on his plea of payment, and that
nothing remained for them to consider except the issues arising
on his cross-petition.

2.  **CONTRACT — Writings — Construction — Question   for   Court.**
Where the contract consists of several written instruments, un-
mixed with disputed parol evidence which may affect construc-
tion, it is the duty of the court to determine what the contract is,
and instruct the jury accordingly.

(Syllabus by the Court.)

*Error from District Court, Oklahoma County; B. F. Burwell,*
*Judge.*

Action by the Northwestern Consolidated Milling Company
against M. C. Bales.  Judgment for plaintiff, and defendant
brings error.  Reversed and remanded.

On September 21, 1903, the Northwestern Consolidated Mil-
ling Company, defendant in error, plaintiff below, sued M. C.
Bales, plaintiff in error, defendant below, in the probate court of
Oklahoma county on account for one car load of Ceresota flour,
sold and delivered to him by shipment from Minneapolis, Minn.,
to Clinton, Ind., about the 10th day of September, 1901, amount-
ing to $507.50, together with 7 per cent. interest from the date of
delivery, in all the sum of $578.55.  Attached to the petition was
a statement of the account sued on.  Defendant pleaded payment,
and plaintiff filed a general denial by way of reply.  There was

judgment for defendant, from which plaintiff, hereafter called the company, appealed to the district court, where, on April 11, 1904, defendant, hereafter called Bales, filed an amended answer and cross-petition, wherein he admitted the purchase of the flour as alleged, but pleaded payment. By way of cross-petition Bales alleged, in substance, that the flour was unwholesome and defective, and would not make good bread, and that he was thereby damaged in the sum of $1,000, in his business as a baker, for which he prayed judgment. There was a general denial, by way of reply, filed by the company, and on November 13, 1905, a trial to a jury resulted in a verdict and judgment in favor of the company for $264.96, and, after motion for a new trial was filed and overruled, the case was duly brought by Bales to this court for review.

*R. M. Campbell,* for plaintiff in error.
*Lewis & McCann,* for defendant in error.

TURNER, J. (after stating the facts as above). To maintain the plea of payment Bales testified that the car of flour was shipped about September 10th, and received by him about the 20th or 25th of September, 1901; that about the time the flour arrived, he received an invoice through the mail; that bill of lading, with draft attached for the purchase price, was sent to the bank in Clinton; that he paid the amount of the draft, got the bill of lading, and afterwards the flour, first paying the freight on the car. The invoice and draft were introduced in evidence, and payment of the draft admitted by the company.

To maintain the issues on the cross-complaint, Bales testified, in substance that the car contained 150 barrels of flour, which he stored until about October 20th, at which time he began using it in his bakery at Clinton; that he immediately thereafter began to have trouble with his bread, and to receive complaint as to his product from customers; that, having previously for a long time used this brand of flour, which had proved to be satisfactory, and being reluctant to believe that it was the fault of the flour, he

discharged several bakers; after using 124 barrels of the flour, he quit the use of the same, and wrote the company, as follows:

"Clinton, Ind. Nov. 1, 1901.

"The Northwestern Consolidated Milling Company, Minneapolis, Minn.—Gentlemen: I write you to-day in regard to the car of flour shipped me September 10, 1901. It has not given satisfaction at all. I refused to think my trouble was on account of the flour, and have changed bakers 5 times, and failed to get bread that would give satisfaction at all; then I got my old hand back and changed flour, and our bread is all right. The dough would look all right in the pan, but would draw up as soon as placed in the oven, and would not take any color. The crust would be hard and full of white specks or blotches. The bread would not keep at all, and before I had no trouble at all. The bread always sprung well in the oven, had a nice ripe color, and soft crust, and would keep 3 or 4 days, and stay perfectly soft and moist. I want to know what you will do about it? You have my order for a car for November delivery; but, if you cannot make this other all right, and send me flour that is all right, and as good as Ceresota has been heretofore, I do not want it at any price. I do not complain simply to get a reduction in the price, or anything like that, for my business and success depends wholly on the quality of my product, and I cannot produce good stuff without good material to produce it from. Please let me know by return mail what you will do, for I have to have flour immediately; and, if you cannot make this all right, I will have to look elsewhere.                    Yours respectfully,

"M. C. BALES.

"P. S. There was not a sack in that car that weighed over 97 lbs. What was the cause of this short weight? Please answer."

And on the same day Bales wrote D. B. Strickler, general sales agent of the company, as follows:

"Mr. D. B. Strickler, Cleveland, Ohio—Dear Sir: I wrote the mill today in regard to trouble I have had with the last car of Ceresota. It has not given satisfaction since I began to use of it. The dough looks all right in the pan, but feels dead, and draws up when placed in the oven. It will not take color, and the crust is hard, dead, and full of white spots or blotches. All the other Ceresota I have used sprung well in the oven, had a

nice ripe color, and the crust was soft, and the bread would keep perfectly soft and moist 3 or 4 days, while this bread will not keep 18 hours. I refused to think my trouble was with the flour, and changed bakers 5 times, but could not get better results, I got my old man back, changed flour, and my bread is all right again. I asked the mill what they could do about it, and would like to know what you think about it. I am in need of flour, and you have my order for a car, but I don't want it unless it is as good as it has been before the last car. If they make it all right, I want it immediately. I want to say that there was not a sack in that last car that weighed over 97 lbs. What is the cause of this short weight? Please answer by return mail.　　Yours respect.,

"M. C. BALES."

And Bales received the following reply from the agent:

"Cleveland, O., Nov. 2, 1901.

"M. .C. Bales, Clinton, Ind.—Dear Sir: Your letter of November 1st received. We are very sorry to hear that your last car of flour was not satisfactory. Please send immediately to Minneapolis about five pounds. Send it by express at their expense. If the flour is not right, we will take it off your hands, but would like to have the company test the sample before shipping it elsewhere. This is the first complaint we have had for a long while, and do not quite understand it, but we guarantee all our flour and will make this right with you.　　Yours truly,

"D. B. STRICKLER.

"P. S. After writing the above letter, we decided to telegraph you, so as to prevent delay."

Pursuant to said postscript the agent telegraphed Bales, who immediately forwarded the samples, and received from the company the following letter:

"Minneapolis, Minn., November 6, 1901.

"Mr. M. C. Bales, Clinton, Indiana—Dear Sir: We have delayed answering your favor of November 1st, as we were waiting to receive our chemist's report on the sample of flour taken from the shipment about which there was some complaint. While the sample is fully up to standard in color, it is a trifle weak, and we will forward to you, as soon as possible, another car, to take the place of the one complained of. We regret exceedingly that there

was any cause for complaint, and trust you will not again have any trouble in this respect. Very truly yours,

"THE NORTHWESTERN CONSOLIDATED MILLING CO.,
"Per K. S."

On November 11th the agent wrote Bales as follows:

"Cleveland, O., Nov. 11, 1901.

"M. C. Bales, Clinton, Indiana—Dear Sir: We wrote you ten days ago with reference to the car of Ceresota which you have on hand, and which is not satisfactory. We have a letter from the company saying that it is not up to standard, and asking us to take it off your hands. We will ship you another car without draft, and when the car arrives, we would like to have you take out the new flour and put in that which you have on hand, so that the car can be forwarded to Cincinnati for disposal. Kindly let us know immediately whether or not this will be satisfactory, and also how much Ceresota you have, so that we can ship the same amount that you have to forward.

"Trusting that we may hear from you by return mail, I am,

"Yours truly,
"D. B. STRICKLER."

To this Bales did not reply, for the reason that on the same day the company wrote him as follows:

"Minneapolis, Minn., November 11, 1901.

"Mr. M. C. Bales, Clinton, Ind.—Dear Sir: Inclosed we hand you bill of lading and corrected invoice for the car of flour, to replace the one which was out of condition. We will adjust the slight difference in freight promptly. We regret very much that the first car was not satisfactory, but think you will find this one fully up to quality. Will trace the car through, and hope you will receive same without delay. Yours truly,

"THE NORTHWESTERN CONSOLIDATED MILLING CO.,
"Per, McL."

· The invoice showed that Bales had bought of the company a car of flour, amounting to $503, less freight $55.50, with no draft attached. Before the car arrived Bales received the following letter from the agent:

"Cleveland, O., Nov. 22, 1901.

"M. C. Bales, Clinton, Ind.—Dear Sir: We are advised by our company at Minneapolis that they shipped you a car of flour

to take the place of the one you said was not satisfactory. We presume it has arrived, and that you complied with their instructions in regard to shipping part of it to Cincinnati. Kindly let us hear from you in the matter. * * * Yours truly,

"D. B. STRICKLER."

In reply to this Bales wrote:

"Clinton, Ind., 11-25, 1901.

"Mr. D. B. Strickler, Cleveland, Ohio—Dear Sir: In reply to yours of the 22d I will say that the car of flour to replace the one complained of, arrived today, 11:25 and I will unload tomorrow and place what I have on hands in the car. I have 52, 98 lb. Sax Ceresota on hand. * * * Yours respect.,

"M. C. BALES."

Acting under these instructions, Bales attempted to replace the unused 26 barrels of flour of the first car in the car from which the second consignment was taken, but was not permitted to do so by the agent of the railroad company, and notified the milling company that he held the same subject to its order. Mr. Ohm, another agent of the company, was present during the unloading, and knew that Bales was not permitted to place the unused flour of the first shipment in the second car, and agreed to inform Mr. Strickler of that fact. Bales paid $55.50 as the freight on this car, and later received the following letter from the agent Strickler:

"Cleveland, O., Dec. 2, 1901.

"M. C. Bales, Clinton, Ind.—Dear Sir: We have a letter from Mr. Ohm, who is working some territory for us, saying that your last car of flour arrived, but that you did not know what to do with the balance of your first car. We supposed our company instructed you to ship that to Cincinnati. Kindly let us know how the car was billed, and how many sacks you have on hand. It will be necessary for us to hear from you promptly in this matter, so that we will know how to make the next shipment. In case that flour is still in your hands, we will want to bill the car to Cincinnati, stop at Clinton, and have you put in the unsatisfactory flour, and take out the same amount of fresh flour. Kindly let us hear from you at once in this matter. * * *

"Yours truly,

"D. B. STRICKLER."

Evidently in reply to a letter from Strickler, Bales, on December 20, 1901, wrote him as follows:

"Mr. D. B. Strickler, Cleveland, Ohio—Dear Sir: Your letter received this a. m., and in answer will say that, as I understand it, and as shown by all correspondence from the mill, the second car of flour was shipped me to take the place of the flour complained of, and they would take the old flour off my hands. The 52 sacks are here subject to their order. If I am not right in this matter, I prefer that you come here immediately and straighten this matter up. Yours respect.,

"M. C. Bales."

Soon thereafter Strickler went to see Bales with reference to the matter, but did not attempt to secure a return of any portion of the first shipment, 26 barrels of which was still on his hands.

On October 16, 1902, the company wrote Bales as follows:

"Minneapolis, Minn., Oct. 16, 1902.

"Mr. M. C. Bales, Clinton, Indiana—Dear Sir: We have been waiting some time for you to make settlement with us for flour shipped for your account. The original bill was $504. We understand that our Mr. Strickler offered to settle the matter for $350, and for the 26 barrels, on basis of $3.60, delivered. This commission under the circumstances is extremely liberal, and much more than we think the circumstances warrant. However, we want to close our books for the year, and will stand Mr. Strickler's proposition, provided immediate remittance is made. Kindly let us hear from you on this subject at once. This matter has been hanging fire quite too long, and we can see no reasonable excuse for further delay. Yours truly,

"The Northwestern Consolidated Milling Co.

"Per, H. P. G."

To this Bales made no reply, and later moved to Oklahoma City, where, on September 21, 1903, this suit was brought, as stated.

The only evidence introduced by the company to rebut Bales' proof of payment was that of H. P. Gallaher, vice president of the company, who testified, in substance, that it was the intention of the company that the draft for the first car should

be applied in payment of the second car; that Bales should take from the second car enough flour to make good his loss on the first car, and put into the second car so much of the flour as remained on hand from the first car, and forward the second car to Messrs. Gale Bros., at Cincinnati; that theretofore the company did not charge Bales with the second car; that the company supposed that, as soon as Bales found the flour to be unsatisfactory, he rejected the entire car, and that, assuming that he had used but a small portion of the first car, the second was agreed to be sent him to replace it. There was further evidence, tending to support the allegations of the cross-petition, but it need not be stated.

At the close of the testimony, showing substantially as stated, counsel for Bales requested the court to instruct the jury as follows: "You are hereby instructed that in this case the plaintiff is not entitled to recover against the defendant upon the cause of action herein sued on, and the only issues for you to determine are as to whether or not the defendant is entitled to recover anything from plaintiff upon his cross-petition filed herein, and, if so, how much"—which was refused by the court, excepted to by counsel for Bales, and is the first assignment of error.

The first clause of this instruction is a request, in effect, to charge peremptorily for the defendant on his plea of payment. If it should have been given, the remainder of that request would be proper, for the reason that the only remaining issues are those arising out of the cross-action. Should the court have so instructed? The contract between these parties being wholly dependent upon letters and a telegram, unmixed with disputed parol evidence, it was the duty of the court to determine what the contract was, and declare the same accordingly, and state, as a matter of law, upon the undisputed testimony of defendant whether the evidence was sufficient to establish his plea of payment.

2 Page on Contracts, § 1129, says:

"The construction of a contract is a question for the court if the terms of the contract and the intrinsic facts which may af-

fect construction are free from dispute. This rule applies where the written contract consists of several writings, as where it consists of letters exchanged between the parties. * * *"—and authorities cited.

In *Scanlan v. Hodges,* 52 Fed. 359, 3 C. C. A. 118, the court said:

"Undoubtedly the general rule is that the question whether given written instruments constitute a contract, as well as the interpretation of such written instruments, when it is determined that they do constitute a contract, belongs to the court, and not to the jury; and this rule is as applicable to commercial correspondence as to a formal written contract. *Brown v. McGran,* 14 Pet. (U. S.) 479, 494, 495, 10 L. Ed. 550; *Turner v. Yates,* 16 How. (U. S.) 16, 23, 14 L. Ed. 824; *Drakeley v. Gregg,* 8 Wall. (U. S.) 242, 19 L. Ed. 409; *Goddard v. Foster,* 17 Wall. (U. S.) 123, 142, 21 L. Ed. 589."

A casual reading of this correspondence will determine what the contract was between these parties. The first car load of flour, which was paid for, being unsatisfactory, and conceded to be such, after test by all parties concerned, was, by agreement, replaced by the second car, for which no charge was made. No fraud on the part of Bales is intimated in procuring this substitution. It was therefore a valid transaction, and must stand. That the company did not know that he had already used 124 barrels of the 150 in the car load when this arrangement was made was not the fault of Bales, but that of the company. Had it desired to know before the second car was sent, it should have taken proper steps to inform itself. On request Bales gave it this information on the day the second car was received, and before it was unloaded, in his letter of November 25th, which was not too late for the company to take steps to protect itself from imposition, if any, in the transaction. None such was intimated at the time, and the record discloses none. That the company cared nothing for the flour remaining from the first car appears from the fact that when, through its agent Ohm, it was informed that the railroad company would not permit Bales to place the remaining 26

barrels in the second car, it paid the matter no serious attention, and overlooked entirely its disposition, when Strickler went to see Bales about it, and has since wholly failed to secure possession of it.

It goes without saying that, on his plea of payment for the first car, which is practically admitted, the company cannot recover for the second car, which is not in issue, by showing its alleged intention, which nowhere appears in the contract, at the time the second car was shipped.

Hence, we are of the opinion that the court erred in refusing to give the instruction as asked; that it should have done so, and thereby eliminated all issues except those arising on the cross-petition, and for that reason this case is reversed and remanded for a new trial.

All the Justices concur.