## CHICAGO CRAYON CO. v. ROGERS *et al.*

No. 1240.   Opinion Filed November 18, 1911.

(119 Pac. 630.)

1.   COMMERCE—Subjects of Regulation—Statutory Provision. Plaintiff, an Illinois corporation, sent agents into the Indian Territory and Arkansas to take orders for enlarging pictures. The orders, when taken, were sent to it at its home office in Chicago, where the pictures were enlarged, and the pictures with frames were shipped by it to agents, different from those who took orders, who delivered them to the patrons and collected the money, which they remitted to plaintiff. **Held,** that this was interstate commerce, and that a failure by plaintiff to designate a resident agent in the Indian Territory upon whom service might be had, under the provisions of secs. 4 and 5, 31 Stat. L. 795, requiring foreign corporations to designate an agent in the Indian Territory before beginning to carry on business, did not render void a bond, executed by one of its delivering agents in the Indian Territory, conditioned for the faithful performance of his duty as such wherever the plaintiff sent him.

2. **SAME—Subjects of Regulation—Statutory Provision.** After the bond was executed, the agent was sent to Arkansas, where the breach of the bond, if any, occurred. **Held,** that a failure by plaintiff to designate a resident agent in Arkansas, upon whom service might be had, as provided by secs. 825 and 829a of Kirby's Digest of the Arkansas Statutes, did not constitute a defense in favor of the sureties on the bond.

3. **SAME—Subjects of Regulation—Business of Foreign Corporation.** A state cannot require a foreign corporation to designate a resident agent, upon whom service may be had, as a condition precedent to its engaging in interstate commerce with residents of the state.

4. **PRINCIPAL AND SURETY—Remedies of Obligee—Notice to Sureties.** Where an agent for the delivery of pictures and collection of the price makes reports as required by the contract of agency, in which reports his shortage appears, and where his conduct is not inconsistent with honesty, his employer is not required to notify the sureties upon his bond to the employer, conditioned to account for pictures and frames shipped to him for delivery, of his default, as a condition precedent to its recovery upon the bond for either the first reported shortage, or shortage subsequent to the first.

(Syllabus by Rosser, C.)

*Error from Pittsburg County Court; R. W. Higgins, Judge.*

Action by the Chicago Crayon Company against Henderson G. Rogers and others. Judgment for defendants, and plaintiff brings error. Reversed, and remanded for new trial.

*A. C. Markley,* for plaintiff in error.

*Lester & Hammond,* for defendants in error.

Opinion by ROSSER, C. This was an action by the Chicago Crayon Company against Henderson G. Rogers, J. J. Brewen, A. F. Holladay, and Philip H. Howe upon a certain bond given by Henderson G. Rogers as agent of the plaintiff company. There was a judgment for the defendants, and plaintiff brings error.

The bond is as follows:

"Know all men by these presents, that we, Henderson G. Rogers, of the city of Krebs, county of Central District, state of Ind. Ter., as principal, and J. J. Brewen, county of Central District, state of Ind. Ter., and A. F. Holladay, county of Cen-

tral District, state of Ind. Ter., as sureties are held and firmly bound to the Chicago Crayon Company, an Illinois corporation, of Chicago, Cook county, Illinois, in the penal sum of five hundred dollars ($500.00) to be paid the said obligee or their legal representative, to the true payment thereof we bind ourselves, our heirs, executors and administrators jointly and severally, firmly by these presents.

"The condition of this obligation is: That whereas, the said bonded Henderson G. Rogers, principal, has been appointed and has agreed to act as agent (known as deliveryman and collector) for and on behalf of the said Chicago Crayon Company in accordance with the terms and provisions of a certain contract (marked 'A,' hereunto attached). Now, therefore, if the said bonded principal shall and does perform all the duties and obligations required of him in said contract, according to the spirit and letter thereof, then this obligation shall become null and void, otherwise to remain in full force and effect.

"It is further agreed that in case of default in any of the conditions by said bonded principal the measure of damages of said party of the first part shall be the amount of goods entrusted to said bonded principal, as shown by the sheets and bills, less amount of cash remitted and goods accounted for by party of the second part to said party of the first part mentioned in said contract.

"It is further understood and agreed to by the sureties that the transferring of the principal from one portion of the country to another and resulting in his necessarily being under the management of a different legal representative of said obligee, known as district manager, does not release said sureties from the obligation of this bond.

"In witness whereof, we have hereunto set our hands and seals this 9th day of November, A. D. 1905."

The contract, marked "Exhibit A," to the bond is as follows:

"Memorandum of agreement, made and entered into this day and date, between the Chicago Crayon Company, a corporation of Chicago, county of Cook, state of Illinois, party of the first part, and Henderson G. Rogers of town of Krebs, state of I. T., party of the second part.

"Party of the second part, known as collector and deliveryman, agrees to deliver portraits, frames and other merchandise, and to receive as compensation therefor the difference in the list price of the frames (Exhibit B, page 3) plus any excess freight, and the amount the frames are sold for.

Chicago Crayon Co. v. Rogers et al.

"Party of the second part agrees to pay all his personal expenses, including livery hire to deliver the portraits and frames, and also to pay all drayage and transfer charges on portraits and frames account of transferring the goods from the depot to which they have been consigned. Party of the first part agrees to pay the freight charges on all portraits and frames from Chicago to points of consignment, except where the freight amounts to more than twenty-five cents (25c) per frame, in which case the party of the second part agrees to pay all charges in excess of that amount.

"He further agrees to forward the lists for each shipment, with money to balance, as the delivery has been made and before lifting the next shipment. Further agrees that in case he is delivering a small shipment where collections will not amount to fifty dollars, to remit the same as soon as delivery is completed. Further agrees that on lifting a shipment to immediately notify the party of the first part of the same, by forwarding lifting card (form A95) (Exhibit C) on that shipment, and further agrees to make out in detail Friday report (form A34) and forward every Friday to party of the first part and a copy to road manager. (Exhibit D.)

"Party of the second part further agrees not to deliver any portrait for less than the regular list price (Exhibit B) and to account for all portraits shipped by a remittance in full, or by returning the eyes of said portraits with a report as voucher for their nondelivery. Party of the second part agrees to account for all frames shipped by a remittance in full at prices per (Exhibit B).

"Party of the second part agrees to remit all collections daily (and report daily if idle) to the main office of the party of the first part at Chicago, Illinois. Party of the second part agrees to truly remit and account for all monies collected upon portraits, frames or other merchandise received and retained by him as agent and custodian aforesaid, and to properly account for and surrender the residue of such portraits, frames and other merchandise aforesaid to and at such time or times as may be requested or demanded by said party of the first part or their legal representative.

"It is also agreed that party of the first part shall not be held responsible for any expense of party of the second part due to the delays in the shipment of or the nonarrival of the aforesaid portraits, frames or other merchandise.

"Party of the second part agrees to exercise. due caution in the care and protection of all portraits, frames and other merchandise (loss or damage by fire or storm excepted) received and retained by him as agent and custodian aforesaid.

"Either party may at any time they deem the business unsafe or unprofitable, terminate this contract by giving notice, either verbal or written, and the party of the second part agrees in event of such notice to turn over to the party of the first part, or its legal representative all supplies, printed matter, and the residue of such portraits, frames and other merchandise not otherwise accounted for.

"Witness our hands and seals this fourth day of November, 1905."

The proof shows that the plaintiff sent out agents into Indian Territory and Arkansas, and took orders for the enlargement of pictures, and for frames, and the orders were sent to the company, at Chicago, where the pictures were enlarged and the frames manufactured; and that the completed pictures were then shipped to other agents of the company, different from those who took the orders, whose business it was to deliver the pictures and collect. Rogers was employed to deliver and collect, and it appears that he delivered for plaintiff, both in the Indian Territory and Arkansas. It also shows that the shortage, if any, arose out of the shipments to him in Arkansas.

The defendant denied liability, upon the ground that at the time the bond and contract were executed plaintiff had no designated agent, either in the state of Arkansas or Indian Territory; and that it was doing business within the state of Arkansas and Indian Territory in violation of the statute requiring foreign corporations to maintain a known place of business, and to have an authorized agent, or agents, upon whom process could be served, within the state and territory, respectively. Defendants also deny that Henderson G. Rogers owed plaintiff anything under his contract. They further answer that the plaintiff released the defendant Henderson G. Rogers from any liability by reason of the fact that after he had delivered a number of pictures and frames in the state of Arkansas he asked permission from the plaintiff to go back to that state and collect for the pictures and

frames, the price of which had not been collected, and the plaintiff, through its manager, directed him to go to the state of Missouri and work for the company there, and agreed that if he would go to the state of Missouri and work for them they would release him from all claims for shortage in the state of Arkansas. The sureties also claim that they were released, because the company did not give them notice that Rogers was short in his accounts when it first discovered that fact, and, after it had ascertained that he was short, that it continued to ship him goods and extend to him credit, without giving them notice.

The plaintiff assigns as error the giving by the court of instructions numbered 4, 5, 6, 7, 9, and 11, and also the refusal of the court to give instructions 4 and 5, requested by plaintiff. Instructions numbered 4, 5, 6, 7, 9, and 11, given by the court, are as follows:

"(4) The court will instruct you, gentlemen, that where one man is employed by another, and bond is made, sureties bind themselves for the payment of the contract. When it becomes known to the principal that default is being made, it is his duty then to notify the sureties. Such duty of disclosure rests upon the theory that the creditor who receives advancements from the principal on the credit of the guarantor, or continues the principal in his service for whose honesty another has become surety, with knowledge that the principal has violated his agreement, or is unworthy of trust, actively conspires to assist the principal in committing default; and that such conduct contains the same element of fraud as the concealment of similar facts at the time of the execution of the contract.

"(5) In other words, gentlemen, if the Chicago Crayon Company had become aware of the fact that the defendant Henderson G. Rogers was in default in his work, then it was their duty to notify the sureties, because that is knowledge that was only known by two parties—Mr. Rogers and the Chicago Crayon Company—in other words, it would not be good faith on the part of the Chicago Crayon Company to continue a man in their employ, if they knew he was in default in his obligations to them, and then look to the sureties.

"(6) The law of suretyship gives to the promisor a right of notice, even though he does not make a stipulation in his con-

tract, whenever such notice is necessary for his protection, as in the case of a commercial guaranty, where the facts upon which his liability rests are not within his knowledge, or depend upon the creditor's option. .

"(7)  However, it is not an insignificant breach of a contract that the Chicago Crayon Company was compelled to give notice of.  It is only these that were absolutely material to the sureties, Mr. Brewen, Mr. Holladay, and Mr. Howe.  Ordinarily it requires fraud or dishonesty of some kind to be shown on the part of Mr. Rogers that would justify or require notice to be given to sureties.

"(8)  If the actions of Mr. Rogers at the time he was working for the Chicago Crayon Company was such that would cause a reasonable man to believe he was dishonest, or was perpetrating fraud on the Chicago Crayon Company, then it would be the duty of the Chicago Crayon Company to notify the sureties.

"(9)  I will instruct the jury this:  A notice must be given. It is immaterial whether it is written or verbal, but notice must be given where it becomes known to the Chicago Crayon Company that its agents were dishonest; then the company should notify the sureties."

"(11)  The court will instruct you, gentlemen, that, if you find from the evidence that there was fraud or dishonesty on the part of the principal, Mr. Rogers, against the Chicago Crayon Company, it was their duty to notify the sureties, but the sureties were responsible for all debts up to the time the notice should have been given, if any notice was necessary."

Instructions numbered 4 and 5, requested by the plaintiff, and refused by the court, are as follows:

"(4)  You are instructed that the law is that the signing and executing the contract and bond in the Indian Territory, covering business to be, and afterwards, done in the state of Arkansas, was not 'doing business' in violation of the laws of the Indian Territory, or of the state of Arkansas, as then existing in November, 1905, requiring an agent for service to be designated by a foreign corporation before doing business within its territory.  Further, the agreed statement of facts is that no such agent had then been designated by the plaintiff, and that the business done under said contract and bond was the shipment by plaintiff from its place of business in the state of Illinois certain goods, ordered by residents of the state of Arkansas, to its agent, H. G. Rogers, in the state of Arkansas for delivery and the col-

lection of the price, and remittance to be made to the company at Chicago. Such acts and business were interstate transactions, and these, together with the making of the contract and the institution of the suit for the collection of the money due under the contract, are all controlled by the laws of interstate commerce, and are not affected by the local laws of any state or territory. And you are instructed not to consider the defenses alleged in the first and second paragraphs of defendants' answer.

"(5)   In another part of their answer, the defendants plead that no timely notice of the default of H. G. Rogers was given to the sureties upon this bond by the plaintiff. But defendants do not plead that they suffered any loss by reason of not getting notice of the default. You are instructed that you need not consider the evidence as to whether any notice of the default was given. Whether this bond sued upon be properly called a surety bond or a guaranty bond, it guaranteed the faithful performance of the contract and the punctual payments to be made by H. G. Rogers. And the signers of such a bond are liable to the guarantee immediately upon the default of the principal, and without demand or notice."

It is proper to notice, first, the refusal of the court to instruct the jury, as requested by plaintiff, that the business of plaintiff was not such as to require it to designate an agent in the Indian Territory. The fact that it had no such agent was pleaded as a defense in the answer and admitted by the plaintiff in the agreed statement of facts. If the fact that plaintiff had failed to designate an agent was not sufficient to render the bond void, then the jury should have been so instructed, and a failure to so instruct upon request of the plaintiff was reversible error. If the failure to designate an agent rendered the contract void, then, the fact that plaintiff had designated no agent being admitted, the court should have instructed the jury to find for the defendant, and it would not be necessary to consider other alleged errors.

The statute requiring the designation of an agent in the Indian Territory (31 Stat. L. 795) is as follows:

"Sec. 4.   That before any foreign corporation shall begin to carry on business in the Indian Territory it shall, by its certificate, under the hand of the president and seal of such com-

pany, filed in the office of the clerk of the United States Court of Appeals for the Indian Territory, designate an agent, who shall reside where the United States Court of Appeals for the Indian Territory is held, upon whom service of summons and other process may be made. Such certificate shall also state the principal place of business of such corporation in the Indian Territory. Service upon such agent shall be sufficient to give jurisdiction over such corporation to any of the United States courts for the Indian Territory. If any such agent shall be removed, resign, die or remove from the Indian Territory or otherwise become incapable of acting as such agent, it shall be the duty of such corporation to appoint immediately, another agent in his place as hereinbefore provided.

"Sec. 5. That if any foreign corporation shall fail to comply with the provisions of the foregoing sections, all its contracts with citizens and residents of the Indian Territory shall be void as to the corporation, and no United States court in the Indian Territory shall enforce the same in favor of the corporation."

Section 825 of Kirby's Digest of the Statutes of Arkansas upon the same subject is as follows:

"Every corporation formed in any other state, territory or country, before it shall be authorized or permitted to transact business in this state, or to continue business therein if already established, shall, by its certificate, under the hand of the president and seal of such company or corporation, filed in the office of the Secretary of State of this state, designate an agent who shall be a citizen of this state, upon whom service of summons and other process may be made. Such certificate shall also state the principal place of business of such corporation in this state. Any corporation so filing such certificate in the office of the Secretary of State shall pay therefor a fee of one dollar for such filing, and a like fee for each subsequent appointment of an agent so filed."

Section 829a of Kirby's Digest of the Statutes of Arkansas is as follows:

"If any such foreign corporation shall fail to comply with the provisions of section 825, all its contracts with citizens of this state shall be void as to the corporation, and no court of this state shall enforce the same in favor of the corporation."

It will be observed that the resemblance between the act of Congress, requiring the designation of an agent in the Indian Territory, and the statute of Arkansas on the same subject is very close. The act of the Arkansas Legislature of 1887 (Laws 1887, p. 234), which was the first statute passed in Arkansas requiring a nonresident corporation to designate an agent in the state, was as follows: "Before any foreign corporation shall begin to carry on business in the state, it shall by its certificate," etc. The act of Congress with reference to the Indian Territory appears to have been modeled after the Arkansas act of 1887.

The first question that arises is whether the various transactions engaged in by plaintiff amounted to carrying on business, within the meaning of the act of Congress, or to transacting business, within the meaning of the Arkansas statute in force at the time the defendant Rogers was employed by plaintiff as deliveryman. It appears that plaintiff sent agents into the Indian Territory and Arkansas, who took orders for enlarging pictures, and for frames for the enlarged pictures, and sent them to plaintiff in Chicago. The work of enlarging the pictures and of manufacturing the frames was done in Chicago, and then the enlarged pictures and frames were shipped to the other agents of plaintiff, known as deliverymen, of whom defendant Rogers was one, at certain points, and the deliveryman then delivered to the customers and collected the price, which was by the deliveryman remitted to plaintiff in Chicago. It would be improper in this opinion to conjecture why the persons taking the orders were not permitted to deliver and collect. It seems that the various acts performed by plaintiff's agents, from the time they first called on persons with intent to persuade them of the advantages of having the likenesses of relatives and friends preserved in large size until other agents delivered the enlarged pictures, collected therefor, and remitted to plaintiff, was carrying on and transacting business.

The case of *International Text-Book Co. v. Pigg,* 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 24 L. R. A. (N. S.) 493, was a suit, brought in the courts of the state of Kansas, by the

International Text-Book Company, of Scranton, Pa., against
Aaron L. Pigg, a citizen of Kansas, to recover a sum of money
due from Pigg upon a contract of subscription for a scholarship
or course of instruction in one of plaintiff's correspondence
schools.  The facts in that case were as follows:  The Interna-
tional Text-Book Company was a Pennsylvania corporation and
the proprietor of the International Correspondence Schools at
Scranton, Pa.  These schools have numerous courses in various
branches of learning.  Its officers and instructors reside in Scran-
ton, Pa., and perform their respective duties there.  Its business
is conducted by preparing and publishing instruction papers, text-
books, and apparatus for courses of study.  It employs local or
traveling agents to procure and forward to the company, at Scran-
ton, applications for scholarships in its correspondence schools,
and also to collect deferred payments on scholarships.  It has
correspondence with these agents about its business, and it sends
its instruction papers, text-books, and illustrative apparatus di-
rectly to its pupils in each state, and instruction is given by means
of correspondence through the mails.  One of its solicitors main-
tained an office in Kansas at his own expense, received a fixed
salary, and sent in daily reports of his business.  At the time
of the suit, a number of persons were taking its courses of in-
struction by mail, and the contracts for the courses had been
procured by the solicitor assigned to that duty in the state of
Kansas, and payment for the courses were collected and remitted
by him to plaintiff in Scranton.  The defendant, Pigg, had signed
a written contract, showing that he had subscribed for a scholar-
ship covering a course of instruction by correspondence in com-
mercial law, and had agreed to pay therefor $84 in installments.
When the suit was brought, there remained unpaid on the prin-
cipal of that subscription the sum of $79.60.  The court held
that under this state of facts the company was doing business in
the state of Kansas.  The court, speaking by Mr. Justice Harlan,
said:

"1.  In view of the nature and extent of the business of the
International Text-Book Company in Kansas, the first inquiry

is whether the statutory prohibition against the maintaining of an action in a Kansas court by 'any corporation *doing business in this* [that] *state*' embraces the plaintiff corporation. It must be held, as the state court held, that it does; for it is conceded that the text-book company did not, before bringing this suit, make, deliver, and file with the Secretary of State, either the statement or certificate required by section 1283 [Gen. St. 1901]; and upon any reasonable interpretation of the statute that company, both at the date of the contract sued on and when this action was brought, must be held as '*doing business*' in Kansas. It had an agent in the state, who was employed to secure scholars for the schools conducted by correspondence from Scranton, and to receive and forward any money obtained from such scholars. Its transactions in Kansas, by means of which it secured applications from numerous persons for scholarships, were not single or casual transactions, such as might be deemed incidental to its general business as a foreign corporation, but were parts of its regular business continuously conducted in many states for the benefit of its correspondence schools."

It is difficult to see why the acts of the Chicago Crayon Company, in this case, were not as much in the nature of doing, or carrying on, or transacting, business as were the acts of the International Text-Book Company in that case.

Finding that plaintiff was carrying on or transacting business in the Indian Territory and Arkansas at the time defendant was employed, the next question to be decided is whether its business was of such a character as to render its contracts void under the statutes quoted.

It is settled that a single or isolated transaction of a corporation will not be void because of the failure by the corporation to designate an agent in the state. This question is settled by the decisions of both Arkansas (*Railway Co. v. Fire Association,* 55 Ark. 163, 18 S. W. 43; *Florsheim Bros. D. G. Co. v. Lester,* 60 Ark. 120, 29 S. W. 34, 27 L. R. A. 505, 46 Am. St. Rep 162), and of the appellate courts having jurisdiction of appeals from the Indian Territory prior to statehood (*Ammons v. Brunswick-Balke-Collender Co.,* 141 Fed. 570, 72 C. C. A. 614; same case in Indian Territory Court of Appeals, 5 Ind. T. 636,

32 S. W. 937), as well as by the Supreme Court of the United States. *Cooper Mfg. Co. v. Ferguson,* 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137. But the transactions of plaintiff in this case were more than isolated transactions, and it cannot escape the inhibition of the statute, upon the ground that this was an isolated contract. It was connected with other continuous acts and conduct which amounted to carrying on business.

Then was the business of the character which the statute was intended to prevent, and was it of a kind that the state of Arkansas could prevent, when the corporation had failed to comply with the statute by appointing an agent? It is well settled that a state cannot prevent a corporation, any more than an individual, from making contracts within the state with reference to or in furtherance of interstate commerce. *Gunn v. White Sewing Machine Co.,* 57 Ark. 24, 20 S. W. 591, 18 L. R. A. 206, 38 Am. St. Rep. 223; *Kindel v. Beck & Pauli Lith. Co.,* 19 Colo. 310, 35 Pac. 538, 24 L. R. A. 311; *Cooper. Mfg. Co. v. Ferguson,* 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137; *Crutcher v. Kentucky,* 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649. In the last case cited, Mr. Justice Bradley said:

"If a partnership firm of individuals should undertake to carry on the business of interstate commerce between Kentucky and other states, it would not be within the province of the state Legislature to exact conditions on which they should carry on their business, nor to require them to take out a license therefor. To carry on interstate commerce is not a franchise or a privilege granted by the state; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States; and the accession of mere corporate facilities, as a matter of convenience in carrying on their business, cannot have the effect of depriving them of such right, unless Congress should see fit to interpose some contrary regulation on the subject.

"It has frequently been laid down by this court that the power of Congress over interstate commerce is as absolute as it is over foreign commerce. Would any one pretend that a state Legislature could prohibit a foreign corporation—an English or French tranportation company, for example—from coming into its borders and landing goods and passengers at its wharves, and

soliciting goods and passengers for a return voyage, without first obtaining from some state officer, and filing a sworn statement as to the amount of its capital stock paid in? And why not? Evidently because the matter is not within the province of state legislation, but within that of national legislation. *Inman Steamship Co. v. Tinker,* 94 U. S. 238, 24 L. Ed. 118. The prerogative, the responsibility, and the duty of providing for the security of the citizens and the people of the United States in relation to foreign corporate bodies, or foreign individuals with whom they may have relations of foreign commerce, belong to the government of the United States, and not to the government of the several states; the confidence in that regard may be reposed in the national Legislature, without any anxiety or apprehension arising from the fact that the subject-matter is not within the province or jurisdiction of the state Legislatures. And the same thing is exactly true with regard to interstate commerce as it is with regard to foreign commerce. No difference is perceivable between the two. *Western U. Tel. Co. v. Texas,* 105 U. S. 460, 26 L. Ed. 1067; *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196, 205, 211, 5 Sup. Ct. 826, 29 L. Ed. 158, 162, 164; *Philadelphia & S. S. S. Co. v. Pennsylvania,* 122 U. S. 326, 342, 7 Sup. Ct. 1118, 30 L. Ed. 1200, 1203; *Norfolk & W. R. Co. v. Pennsylvania,* 136 U. S. 114, 118, 10 Sup. Ct. 958, 34 L. Ed. 394, 396. As was said by Mr. Justice Lamar, in the case last cited: 'It is well settled by numerous decisions of this court that a state cannot, under the guise of a license tax, exclude from its jurisdiction a foreign corporation engaged in interstate commerce, or impose any burdens upon such commerce within its limits.'"

Further in the same opinion he says:

"The case is entirely different from that of foreign corporations seeking to do a business which does not belong to the regulating power of Congress. The insurance business, for example, cannot be carried on in a state by a foreign corporation without complying with all the conditions imposed by the legislation of that state. So with regard to manufacturing corporations, and all other corporations whose business is of a local and domestic nature, which would include express companies whose business in confined to points and places wholly within the state. The cases to this effect are numerous. *Bank of Augusta v. Earle,* 13 Pet. 519, 10 L. Ed. 274; *Paul v. Virginia,* 8 Wall. 168, 19 L. Ed. 357; *Liverpool Ins. Co. v. Massachusetts,* 10 Wall. 566, 19 L. Ed. 1029; *Cooper Mfg. Co. v. Ferguson,* 113 U. S. 727,

5 Sup. Ct. 729, 28 L. Ed. 1127; *Philadelphia F. Ass'n v. New York,* 119 U. S. 110, 7 Sup. Ct. 108, 30 L. Ed. 342."

See, also, Watson on the Constitution, 542; Willoughby on the Constitution, sec. 324, and the following sections.

If, then, the business in which plaintiff was engaged was interstate, it follows that the bond sued on was not void because no agent had been designated by plaintiff. The case of *Caldwell v. North Carolina,* 187 U. S. 622, 23 Sup. Ct. 229, 47 L. Ed. 336, arose out of a prosecution of an agent of the Chicago Portrait Company for the violation of an ordinance of the city of Greensboro, N. C., which provides:

"That every person engaged in the business of selling, or delivering picture frames, pictures, photographs, or likenesses of the human face in the city of Greensboro, whether an order for the same shall have been previously taken or not, unless the said business is carried on by the same person in connection with some other business for which a license has already been paid to the city, shall pay a license tax of $10.00 for each year."

The agent of the Chicago Portrait Company received the pictures and frames from the freight office of the railroad company, took them to his rooms in Greensboro, broke the bulk, placing the pictures in their proper frames, and from this point delivered the pictures, one at a time, to the purchasers in the city of Greensboro. He was convicted in the lower court, and his conviction affirmed by the Supreme Court of the state of North Carolina. On appeal to the Supreme Court of the United States, the case was reversed; the Supreme Court holding that the defendant was engaged in interstate commerce, and that the ordinance of the city of Greensboro was void as an attempt to regulate interstate commerce. In the course of the opinion, Mr. Justice Shiras said:

"Nor does the fact that these articles [referring to the pictures and frames] were not shipped separately and directly to each individual purchaser, but were sent to an agent of the vendor, at Greensboro, who delivered them to the purchaser, deprive the transaction of its character as interstate commerce. It was only that the vendor used two instead of one agency in the delivery. It would seem evident that if the vendor had sent the

articles by an express company, which should collect on delivery, such a mode of delivery would not have subjected the transaction to state taxation. The same could be said if the vendor himself, or by a personal agent, had carried and delivered the goods to the purchasers. That the articles were sent as freight by rail, and were received at the railroad station by the agent, who delivered them to the respective purchasers, in nowise changes the character of the commerce as interstate."

It will be observed that the facts in the case of *Caldwell v. North Carolina,* with reference to the character of the business, are identical with the facts in this case. In *Rearick v. Pennsylvania,* 203 U. S. 507, 27 Sup. Ct. 159, 51 L. Ed. 295, the facts are very similar, and the holding the same. See, also, *Brennan v. Titusville,* 153 U. S. 289, 14 Sup. Ct. 829, 38 L. Ed. 719; *Stockard v. Morgan,* 185 U. S. 27, 22 Sup. Ct. 576, 46 L. Ed. 785; *Leisy v. Hardin,* 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128.

In *Gunn v. White Sewing Machine Company,* 57 Ark. 24, 20 S. W. 591, 18 L. R. A. 206, 38 Am. St. Rep. 223, which was a suit on a bond executed by A. I. Julian, as principal, and Gunn, as surety, conditioned that Julian should pay any indebtedness to the White Sewing Machine Company which might thereafter arise out of the purchase and sale of sewing machines, or otherwise, under a contract of the same date, wherein the company agreed to sell their machines to Julian at a stipulated price, and Julian agreed to canvass Faulkner county, or have it canvassed, for the White Sewing Machine Company, the evidence showed that the White Sewing Machine Company sold or shipped to Julian its machines, charging them to him at a stipulated price. On or about the 12th of each month, the company mailed Julian a statement of his indebtedness. The contract provided that he should give a promissory note for the amount stated within 30 days, payable 6 months from the date of the statement, with an option to him to pay the amount of the statement within 30 days, less discount of 5 per cent. Julian agreed to canvass Faulkner county for the sale of the White Sewing Machine, exclusive of any other make or makers. The contract and bond were executed on behalf of the White Sewing Machine Company by S. B.

Kirby, who was the agent for the White Sewing Machine Company in Arkansas for making and forwarding contracts. It was his duty to secure the services of agents in the state of Arkansas. The company, at the time the contract was ordered, had agents in 30 or 40 counties in the state, and the White Sewing Machine Company had that many contracts with its agents. Under these facts, the court held that the business of the White Sewing Machine Company in Arkansas was of the character of interstate commerce, and that the fact that the company had no designated agent in Arkansas, upon whom service could be had, was no defense in favor of the surety to the action on the bond. After reviewing the authorities bearing upon the proposition, the court, speaking by Mr. Justice Battle, said:

"In this case the contract between the corporation and Julian and the bond sued on were executed in this state, and were business transacted in Arkansas. But no sales or indebtedness were created by them. The contract was only an agreement to sell, and the bond was a condition upon which the corporation agreed to sell and a means adopted to secure the indebtedness to be contracted by sales, and both constituted a contract. They were made a foundation of a future trade between a corporation of one state and a citizen of another, and were a direct method devised to increase the business of the former, and, as to them, served as a basis of interstate commerce. Relying on them, the corporation sold the machines and other property, and shipped them from the state of Ohio, its place of manufacture and business, to Julian, in Arkansas; the place of sales being in Ohio. Until they ceased, according to their terms or by agreement of the parties, to be of any force, they were an inducement to, and entered into, every sale, and formed a part of it. According to the principles firmly established by numerous decisions of the Supreme Court of the United States, they [the bond and contract], the sales and shipment of the machinery and other property, were a part of the interstate commerce of the United States, which Congress has the exclusive right to regulate, and were not and could not be affected by the act of April 4, 1887."

This case is directly in point, and is authoritative, at least as indicating that the courts of Arkansas would hold the bond sued on to be a contract exempted from the provisions of the

statute of Arkansas, requiring corporations to designate an agent in the state.

A fair interpretation of 'these authorities leads to the conclusion that the business in which plaintiff in this case was engaged was in its nature interstate, and the state of Arkansas had no right to require the corporation to appoint any agent as a condition upon which it could engage in interstate business in the state. The bond given by defendant Rogers was in furtherance of the interstate business, and entered into and formed a part of it. The case of *International Text-Book Company v. Pigg,* 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 24 L. R. A. (N. S.) 493, requires scrutiny in this connection. A careful examination of that case shows that it is in harmony with this view, although the first part, of the opinion, quoted at length in this opinion, would not leave that impression, unless carefully compared with the latter portion.

In that case the statute of Kansas required all corporations doing business in that state, except banking, insurance, and railroad corporations, to file a statement with the Secretary of State annually, on or before the 1st day of August, and required that the statement should set forth the authorized capital stock, paid-up capital stock, par value and market value of each share of said stock, a complete statement of the assets and liabilities of the corporation, a full and complete list of the stockholders, with the post-office address of each, and number of shares held and paid for by each, the name and post-office address of the officers, trustees, and directors, and the manager elected for the ensuing year, etc., and provided that the failure of any corporation to file the statement provided for within ninety days from the time provided for filing same should work a forfeiture of the charter of any corporation organized under the laws of the state, and that such failure by any corporation doing business in the state, and not organized under the laws of the state, should work a forfeiture of its right or authority to do business in the state. It provided further that no action should be maintained or recovery had in any of the courts of Kansas by any corporation doing

business in the state without first obtaining the certificate of the Secretary of State that the statement provided for in this section had been properly made.   The court, as above stated, held that the International Text-Book Company was doing business in the state, within the meaning of the statute, and quoted with approval the holding of the Kansas Supreme Court that it "was the intention of the Legislature that the statute should reach every continuous exercise of a foreign franchise," and that it should apply, even where the business of the foreign corporation was purely interstate commerce, citing *Deere v. Wyland,* 69 Kan. 255, 76 Pac. 863, *State v. Book Company,* 65 Kan. 847, 69 Pac. 563, *Commission Company v. Haston,* 68 Kan. 749, 75 Pac. 1028, and said that, in the judgment of the court, the rulings in those cases as to the scope of the statute were correct. But further in the opinion it was decided that the business of the text-book company was interstate commerce, and it was held that it was not competent for the state to prescribe, as a condition of the right of the text-book company to do interstate business in Kansas, that it should prepare, deliver, and file with the Secretary of State the statement as above set forth.   In the course of the opinion, the court says:

"It is true that the statute does not, in terms, require the corporation of another state engaged in interstate commerce to take out what is technically 'a license' to transact business in Kansas.   But it denies all authority to do business in Kansas, unless the corporation makes, delivers, and files a statement of the kind mentioned in section 1283.   The effect of such requirement is practically the same as if a formal license was required, as a condition precedent to the right to do such business.   In either case, it imposes a *condition* upon a corporation of another state seeking to do business in Kansas, which, in the case of interstate business, is a regulation of interstate commerce, and directly burdens such commerce.   The state cannot thus burden interstate commerce."

Further in its opinion the court questions the right of the state to forbid its courts from taking jurisdiction of a suit, brought by a corporation of another state, and engaged in interstate business, upon a valid contract arising out of such busi-

ness, and made with. it by a citizen of Kansas, but it does not expressly decide the point.

But the Arkansas courts, under the ruling in *Gunn v. White Sewing Machine Company*, 57 Ark. 24, 20 S. W. 591, 18 L. R. A. 206, 38 Am. St. Rep. 223, would undoubtedly enforce a contract valid as an interstate contract, and the United States courts in the Indian Territory would do so for the same reason. It may well be doubted if any court can or will decline to enforce a contract made in pursuance of law.

It has been suggested, though not in the briefs of counsel in this case, that, as Congress had plenary power over the Indian Territory prior to statehood, and full power to prohibit all commerce, not only by corporations, but by individuals, in the Indian country, foreign corporations were prohibited by the act from engaging in any business in the Indian Territory until they complied with the act, and that the question of whether or not the business was interstate was immaterial. Congress undoubtedly had the right to prohibit any sort of commerce in the Indian Territory, but they did not intend by the act quoted to exercise that right as against foreign corporations. The requirement of the act that the certificate to be filed with the clerk of the United States Court of Appeals should state where the principal place of business of the corporation was located seems to imply that purely interstate commerce was not prohibited. It was the intention of Congress in enacting the statute to extend to the people of the Indian Territory the same protection against "wild-cat" corporations that was enjoyed by the people of the states having similar statutes, and the act of Congress must be construed in the same manner as a similar statute of a state.

In arriving at these conclusions, the case of *Chattanooga Nat'l Bldg. & L. Ass'n v. Denson*, 189 U. S. 408, 23 Sup. Ct. 630, 47 L. Ed. 870, has not passed unnoticed, but that case is not controlling of the questions involved in this. In that case the loan association lent money to a resident of Alabama, and took a mortgage on certain real property in Alabama to secure the payment. In a suit to foreclose the mortgage, the mortgagor

made the defense that the loan company had not designated an agent before the mortgage was taken. The statute made it unlawful for the company to transact any business in the state before designating an agent and a place of business in the state. The court held that the mortgage could not be enforced, and held that the fact that the note for the borrowed money was drawn in Tennessee and payable in Tennessee did not prevent the transaction from coming within the terms of the statute. It appears that the mortgage was executed in Alabama, and that the note was signed there. Emphasis was laid upon the term "any business" in the Alabama statute. The question whether the business was interstate was not discussed, but it seems clear that the taking of a mortgage which is to affect title to the lands of a state cannot be interstate business. To enforce it, the courts of the state must be resorted to, and it is in every way different from commerce in the ordinary sense, controversies arising out of which give rise to transitory actions cognizable anywhere that service may be had.

As the business in which plaintiff was engaged was interstate, and the bond sued on was in furtherance of the interstate business, it was not essential to its validity, in either the Indian Territory or Arkansas, that plaintiff should have designated an agent upon whom service of process might be had. The fact that plaintiff had not designated such an agent was pleaded as a defense to the action, and was admitted by the agreed statement of facts. It was thus before the jury, and the court should have instructed the jury with reference to the legal effect of the failure to designate such agent, when requested by the plaintiff. It is the duty of a court of record to instruct as to the law with reference to all matters within the issues, when requested. *Bales v. Northwestern Consol. Milling Co.,* 21 Okla. 421, 96 Pac. 599; *Dunlap & Taylor v. Flowers,* 21 Okla. 600, 96 Pac. 643; Brickwood's Sackett's Instructions to Juries, section 170.

The other error assigned by plaintiff was the giving of instructions 4, 5, 6, 7, 8, 9, and 11, and the refusal to give instruction No. 5, requested by plaintiff. This assignment involves the

question as to what duty the plaintiff owed the sureties to give them notice of the principal's default. The court in effect told the jury in his instructions 4, 5, and 6, that it was the duty of the plaintiff to notify the sureties as soon as it knew of Roger's default in remitting, and that by continuing him in its employment and failing to notify the sureties plaintiff was committing a fraud upon the sureties. This was stating the rule too broadly, and the error is not cured by the subsequent instructions. It is true the seventh, eighth, and eleventh instructions limit the others to some extent. In the seventh, eighth, and eleventh instructions, the jury was told that it must appear that Rogers had been guilty of fraud or dishonesty of some kind, before the sureties would be discharged for the failure to give notice. But they seemed at least to imply that he had been guilty of conduct requiring the sureties to be notified. Instruction nine especially tended to impress the jury that, in the opinion of the court, a notice to the sureties was necessary. The bond sued on in this case was an absolute undertaking that Rogers would perform all the duties and obligations arising out of his employment as agent, as set out in the written contract of employment, and the rule is that sureties upon absolute undertakings are not entitled to notice of the default of their principal. 32 Cyc. 107, and cases cited.

The bond sued on was executed prior to statehood, and all transactions out of which this controversy arose took place in the Indian Territory and Arkansas, and were completed before statehood. A decision of the Arkansas Supreme Court must therefore be, if not controlling, at least very persuasive. In the case of *Wilkerson v. Crescent Insurance Company,* 64 Ark. 80, 40 S. W. 465, 62 Am. St. Rep. 152, the insurance company brought a suit against Wilkerson as surety on a bond given by Ingalls for the performance of his duty as agent of the company. The proof showed that Ingalls was in default in his settlements, with the knowledge of the company, for about three years, during which he continued work for the company, and that the company did not notify the surety. The surety was held liable; the court in its opinion citing with approval *Watertown Ins. Co. v. Sim-*

*mons,* 131 Mass. 85, 41 Am. Rep. 196; *Atlantic & Pac. Tel. Co.. v. Barnes,* 64 N. Y. 385, 21 Am. Rep. 621; *McKecknie v. Ward,* 58 N. Y. 541, 17 Am. Rep. 281. The surety signing a bond, such as the one sued on in this case, undertakes that the principal will perform his contract. A failure to perform renders him liable without notice. It is only where there is moral turpitude upon the part of the principal, as distinguished from a mere failure to perform his contract, that the duty is imposed on the obligee to notify the surety. There is no evidence in this case showing that Rogers had been guilty of moral turpitude. He made correct statements of his accounts. He did not conceal his alleged shortage. He continued working, apparently intending to satisfy his employer, and there was no evidence in the case tending to show that he was guilty of any criminal misconduct. See *Home Insurance Co. v. Holway,* 55 Iowa, 571, 8 N. W. 457, 39 Am. Rep. 179; *Richmond P. R. R. Co. v. Kasey,* 30 Grat. (Va.) 218.

By signing the bond, the sureties promised to make good the shortage of the principal. The obligee had the right to rely on the bond, and to continue to ship its agent pictures and frames for delivery. The bond was given to secure it for shipments so made, and until something occurred which would justify the obligee in saying to the sureties that the principal was a dishonest rascal it was under no duty to say anything. Nothing in the proof in this case would have justified such a charge. The fifth instruction requested by the plaintiff should have been given.

The judgment should therefore be reversed, and the cause remanded for a new trial.

By the Court: It is so ordered.

All the Justices concur.